**UNITED STATES Appellee**

v.

**Michael R. HENRY Staff Sergeant (E–5), U.S. Air Force, Appellant**

**No. ACM 38886**

U.S. Air Force Court of Criminal Appeals.

Sentence adjudged 23 April 2015 by GCM convened at Dover Air Force Base, Delaware.

Decided 17 February 2017

■■■■■■■■■■■■■■■■

For Appellant: Major Jeffrey A. Davis, Jr., USAF.

For Appellee: Major Rebecca A. Magnone, USAF; Major Mary Ellen Payne; and Gerald R. Bruce, Esquire.

Before MAYBERRY, SANTORO, and SPERANZA, Appellate Military Judges.

Judge SANTORO delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge SPERANZA joined.

## PUBLISHED OPINION OF THE COURT

SANTORO, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of raping, strangling, and threatening EW, and sexually assaulting Airman First Class (A1C) KJ, in violation of Articles 120, 128, and 134, UCMJ, 10 U.S.C. §§ 920, 928, 934. The adjudged and approved sentence was a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to E–1.

Appellant raises five assignments of error: (1) the evidence is legally and factually insufficient to sustain the rape and sexual assault convictions; (2) his right to a pretrial investigation under Article 32, UCMJ, 10 U.S.C. § 832, was violated; (3) Military Rule of Evidence (Mil. R. Evid.) 413 is unconstitutional as applied to him in this case; (4) the military judge's instructions were erroneous; and (5) he is entitled to relief for conditions of his post-trial confinement.[1]

We find that the military judge's instructions allowed the consideration of charged misconduct in a manner that violates *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016). Accordingly, we set aside the guilty findings for Charge I, Article 120, UCMJ, and its Specifications. We affirm the remaining find-

ings, set aside the sentence, and remand the record.

## I. BACKGROUND

In December of 2013, Appellant met EW, a civilian, on a dating web site. They began dating shortly thereafter but Appellant ended the relationship after approximately three months. EW testified that approximately one month after they broke up, Appellant appeared at EW's house uninvited. When EW came to the door, Appellant began yelling at her, asked her why she was being a "f[* * *]ing b[* * * *]," and told her he would "teach [her] a lesson." Appellant retrieved a baseball bat from his truck and EW closed and locked her door thinking that he was going to shatter her car's windshield. Instead, Appellant hit EW's door with the bat until she opened it.

Once inside, Appellant demanded to see EW's phone. Afraid Appellant would hurt her if she did not comply, she brought him upstairs to her bedroom where her phone was. Appellant looked through the phone and read her text messages. He then sent an e-mail to EW's ex-boyfriend (that would appear as though EW had sent it) saying that she was "f[* * *]ing" Appellant and comparing his penis size to her ex-boyfriend's.

After sending the e-mail, Appellant stood in front of EW, choked her, made a fist, and told her that his fist "would f[* * *]ing destroy your face. Your parents will come home Sunday from the beach and you will be unrecognizable." EW was having difficulty breathing as Appellant continued to squeeze her neck.

Eventually, Appellant released her and she curled up on the end of her bed, sobbing. Appellant apologized, calmed down, and began to leave, but changed his mind and told her that she had to have sex with him. Back on the bed, Appellant forced her to have intercourse and left the house when he was finished.

At approximately the same time Appellant first met EW, he met A1C KJ on a different web site and began dating her as well. About

---

1. The first and second issues are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

three months into their relationship, Appellant went on leave and A1C KJ picked him up from the airport upon his return. A1C KJ spent the night. According to A1C KJ, Appellant joined her in bed after she had fallen asleep and initiated what she thought would be "normal sex." Instead, Appellant became more forceful, slapped her with an open palm, and choked her until she gasped for air.

A1C KJ blacked out. According to A1C KJ, when she regained consciousness, Appellant was pushing her legs up and trying to insert his penis into her anus. She complained that it hurt but she testified that he continued, entering her and causing her to scream and cry.[2]

Three days later, Appellant sent a text message to A1C KJ telling her not to contact him until she had stopped speaking with other men. In response, A1C KJ blocked Appellant's number from her phone because she did not want to have any further contact with him and she thought he also believed the relationship was over.

The day after A1C KJ blocked Appellant's number, he showed up at her home without warning. A1C KJ did not open the door. Appellant began throwing rocks at her window until she relented and opened the door to let him in. He expressed anger at her for blocking his number and asked her to return a sex toy that he had left at her house. Appellant entered the apartment and followed A1C KJ to her bedroom to retrieve the toy.

In her bedroom, Appellant repeated his frustration at having his phone number blocked. He grabbed A1C KJ by the throat and removed much of her uniform and undergarments. He grabbed her by the hair, forced her to her knees, and made her perform fellatio. Appellant slapped her on the face, pushed her to the floor, and entered her vaginally. A short time later he pushed her legs up and entered her anally and told her that she had better not scream. Near the end of the assault, he inserted the sex toy into

A1C KJ's anus while he entered her again vaginally. He left after telling A1C KJ that she had to unblock his phone number and that he would text her later.

## II. DISCUSSION

### A. Sufficiency of the Article 32, UCMJ Hearing

Article 32, UCMJ, 10 U.S.C. § 832, sets forth procedural requirements that must be followed before charges can be referred to trial by general court-martial. Appellant asserts that the Government failed to comply with Article 32 in three ways: (1) an appearance of unlawful command influence was created when the preliminary hearing officer (PHO) was also a reservist assigned to the same legal office that prosecuted his case, (2) he was entitled to a hearing under the rules as they existed when the pre-trial hearing was ordered as opposed to those in effect on the date the hearing was conducted, and (3) the PHO erred by following guidance from The Judge Advocate General of the Air Force (TJAG) instead of that found within Rule for Courts–Martial (R.C.M.) 405. He raised each of these arguments before the military judge and requested a new Article 32 hearing. The military judge denied the request.

We review a military judge's denial of Appellant's motion for a new Article 32 investigation for an abuse of discretion. *United States v. Davis*, 62 M.J. 645, 647 (A.F. Ct. Crim. App. 2006), *aff'd*, 64 M.J. 445 (C.A.A.F. 2007). Under an abuse of discretion standard, we will not overturn a military judge's factual findings unless they are clearly erroneous and we review his conclusions of law de novo. *United States v. Larson*, 66 M.J. 212, 215 (C.A.A.F. 2008).

With respect to the unlawful command influence claim, the burden of raising the issue rests with trial defense counsel. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). The defense must: (1) "show facts which, if true, constitute unlawful com-

---

2. This first incident with A1C KJ was charged as vaginal and anal rape. The members acquitted Appellant of both specifications. We include this summary of A1C KJ's testimony on the offenses for which Appellant was acquitted because it is relevant to our discussion of two of Appellant's assignments of error.

mand influence," and (2) show "the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Id.* (citation omitted). To meet the threshold for raising this issue, trial defense counsel is required to present "some evidence" of unlawful command influence. *Id.* If the defense meets that burden to raise the issue, the burden shifts to the Government, which must: "(1) disprove the predicate facts on which the allegation of unlawful command influence is based; (2) persuade the military judge that the facts do not constitute unlawful command influence; or (3) prove at trial that the unlawful command influence will not affect the proceedings." *United States v. Simpson*, 58 M.J. 368, 373 (C.A.A.F. 2003) (internal quotation marks and citation omitted). " 'Whichever tactic the Government chooses, the quantum of proof is beyond a reasonable doubt.' " *Id.* (quoting *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)). Where, as here, the issue is litigated at trial, the military judge's findings of fact are reviewed under a clearly-erroneous standard but whether command influence flows from those facts is a question of law that this court reviews de novo. *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999).

The military judge made extensive findings of fact that are supported by the record and Appellant has not identified any he believes were clearly erroneous. We adopt the military judge's findings and summarize them below.[3]

### 1. Background and Changes to Article 32, UCMJ

The National Defense Authorization Act for Fiscal Year 2014 (FY14 NDAA), Pub. L. No. 113–66, 127 Stat. 672, § 1702, 954–58 (2013), fundamentally changed Article 32. Whereas the old Article 32—the version in effect at the time of Appellant's alleged criminal conduct, preferral of charges, and ordering of the Article 32 hearing—provided for a

"thorough and impartial investigation," the Article 32 in effect on the date of Appellant's 12 January 2015 hearing called for a "preliminary hearing" conducted by a PHO. The Article 32 amendments in the FY NDAA took effect "one year after the date of the enactment" of the Act, and so were in effect as of 26 December 2014. *Id.* at 958.

The new Article 32 differs from the old Article 32 in several additional ways. Among them: the new Article 32 expressly limits the scope of the proceeding whereas the old Article 32 contemplated "a thorough ... investigation of all matters" related to the charges under investigation. The old Article 32 required an "inquiry as to the truth of the matter" whereas the new Article 32 requires only a probable cause determination. The old Article 32 allowed an accused to call witnesses and present "anything he may desire"; the new Article 32 limits the scope of information considered to that which is relevant to a probable cause determination.

In an 18 December 2014 memorandum, TJAG notified JAG Corps personnel of the significant changes made to Article 32. He also noted that due to the extensive staffing necessary, the Executive Order implementing corresponding regulatory changes would not be signed prior to the effective date of the new Article 32. TJAG advised JAG Corps members to review training materials created by the Air Force Legal Operations Agency's Military Justice Division (AF-LOA/JAJM), including a JAJM-created "Preliminary Hearing Officer's Guide."

The PHO's Guide (Guide) echoed TJAG's statement that revised regulations for the conduct of preliminary hearings would not be implemented immediately, but included the Executive Order's planned changes and referred to them as "Air Force Rules Governing Article 32 Preliminary Hearings (AF Rules)." The Guide did not direct compliance with these "AF Rules" but instead reminded PHOs that their authority was derived from their appointment memorandum signed by the convening authority.[4]

---

3. For clarity, we refer to the versions of Article 32, UCMJ, and Rule for Courts–Martial (R.C.M.) 405 that were in effect prior to the Fiscal Year 2014 (FY14) National Defense Authorization Act (NDAA), as the "old" versions of the same; we

refer to the FY14 NDAA's Article 32 and the 2015 Executive Order's R.C.M. 405 as the "new" versions of the same.

4. In contrast, both the Army and Navy–Marine Corps issued Secretarial guidance similar to the

On 3 December 2014, charges were preferred against Appellant. On 24 December 2014, the special court-martial convening authority (SPCMCA) appointed Major (Maj) JM as the PHO.[5] In the appointment memorandum, the SPCMCA directed Maj JM to follow the procedures contained in the Guide (including the AF Rules).

The Article 32 preliminary hearing was held on 12 January 2015. The PHO followed the procedures in the Guide as directed by the SPCMCA. Defense counsel objected to the use of the Guide's procedures instead of those contained in the old R.C.M. 405 and argued that the use of those procedures constituted unlawful command influence (UCI). The Defense further argued that the new Article 32 violated the Ex Post Facto Clause[6] and the PHO was not neutral and detached.

On 22 June 2015, the President issued Executive Order 13696 which, in part, promulgated a new R.C.M. 405 implementing the new Article 32's substantive and procedural requirements.

### 2. Appointment of the PHO

■ Maj JM was a reserve judge advocate assigned to the same office that ultimately prosecuted Appellant. As a civilian she served in the office of the Air Force General Counsel. Appellant objected to Maj JM's appointment because he found it "unsettling" that a military judge was not appointed as PHO.[7] He also argued that her civilian employment, and her use of her civilian e-mail account on the military network, created a conflict of interest because there was a "deeply-held belief in the victims advocacy political agenda that seeks to adopt a generalized rule regarding the inherent credibility of alleged victims" and that Maj JM would

not have made decisions favorable to Appellant because of her fear of backlash from or upon the Secretary of the Air Force.

■ "Since correct examination of this question must involve a recognition that the Article 32 investigating officer performs a judicial function, the pertinent determination for a court must be whether the judicial nature of that office has been maintained." *United States v. Payne*, 3 M.J. 354, 355 (C.M.A. 1977). We agree with our Army colleagues that an Article 32 investigating officer's assignment to the same legal office that ultimately prosecutes the case does not, in and of itself, create an appearance of partiality that requires disqualification, *United States v. Reynolds*, 19 M.J. 529 (A.C.M.R. 1984), *aff'd*, 24 M.J. 261 (C.M.A. 1987), and we see no reason not to apply the same rule to a PHO.

The military judge made short work of this allegation, finding that Appellant presented no evidence aside from the offices to which she was assigned to support the claim that the PHO was improperly appointed or was anything other than the impartial officer required. We agree.

### 3. Ex Post Facto Clause

■ We next consider whether Appellant was entitled to an Article 32 "investigation" (under the old Article 32) or a "preliminary hearing" under the new Article 32. In confronting a similar question with respect to an amendment of Article 2, UCMJ, 10 U.S.C. § 802 (which establishes UCMJ jurisdiction), our superior court noted that the analysis begins with congressional intent. *United States v. McDonagh*, 14 M.J. 415, 417 (C.M.A. 1983). Here, there is a clear expression of congressional intent: the new Article

---

"AF Rules." *See* Army Directive 2015-09 ("Implementation of Section 1702 of the National Defense Authorization Act for Fiscal Year 2014—Article 32, Uniform Code of Military Justice Preliminary Hearing"), (24 February 2015) (Army), ALNAV 086/14 ("New Article 32, UCMJ, Preliminary Hearing Procedures"), (22 December 2014) (Navy).

**5.** A different officer had previously been appointed as the Article 32 investigating officer (IO), but when it became clear due to scheduling issues—

including a Defense-requested delay—that the hearing would occur after the effective date of the new Article 32, the IO was replaced with Maj JM because the IO did not possess the qualifications required of a PHO.

**6.** U.S. CONST., Art I, § 9.

**7.** Neither the old Article 32 nor the new Article 32 require or express a preference that a military judge serve as IO or PHO.

32 was to apply to all hearings conducted on or after 26 December 2014.

Because it was Congress's intent that the new Article 32 apply in Appellant's case, we next must consider whether such an application violates the Ex Post Facto [8] Clause of the Constitution. *Id.* at 419.

In 1915, the United States Supreme Court summarized the original meaning of the Ex Post Facto Clause as follows:

> any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.

*Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925).

Sixty-five years later, in *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), the Supreme Court revisited what it meant to violate the Ex Post Facto Clause. Chief Justice Rehnquist reaffirmed the validity of the *Beazell* definition but sharpened it: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Id.* at 39, 110 S.Ct. 2715.

■ As noted above, the focus of Article 32 shifted from an investigation of the crimes charged (and a discovery mechanism for an accused) to a probable cause determination.[9] Appellant asserts that he suffered loss resulting from the new Article 32 procedures in that the PHO considered unsworn statements which would not have been allowable under the rules implementing the old Article 32. The prohibition against "ex post facto laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed." *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344, (1977) (quoting *Gibson v. Mississippi*, 162 U.S. 565, 590, 16 S.Ct. 904, 40 L.Ed. 1075, (1896)). The Supreme Court has also held that broadening the rules of allowable evidence does not per se violate the Ex Post Facto Clause:

> The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute. Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offence was committed, might, in respect of that offence, be obnoxious to the constitutional inhibition upon ex post facto laws. *But alterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt,* but—leaving untouched the nature of the crime and the amount or degree of proof essential to conviction—only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at

---

8. There are two Ex Post Facto Clauses within the Constitution. The first, Art. I, § 9, states that "No bill of attainder or ex post facto Law shall be passed." The second, Art. I, § 10, says that "No state shall ... pass any ... ex post facto law." Although it is only the former which is applicable to the federal government, much of the Supreme Court precedent related to ex post facto interpretation arises from challenges to state action under Section 10. To the extent we cite Section 10 ex post facto decisions, we do so as persuasive authority guiding our Section 9 analysis.

9. The Guide summarized the changes to Article 32 as follows:

 The new purpose of the Article 32 preliminary hearing is limited to an examination of those issues necessary to determine whether there is probable cause to conclude that an offense has been committed and whether the accused committed it. The other limited functions of the preliminary hearing are to determine whether a court-martial would have jurisdiction over the offenses(s) and the accused; to consider the form of the charge(s); and to recommend the disposition that should be made of the charge(s). A preliminary hearing is not intended to serve as a method for the government to perfect its case against the accused and is not intended to serve as a means of discovery or to provide a right of confrontation required at trial.

 AFLOA/JAJM Article 32 Preliminary Hearing Officer's Guide, at 5 (23 Dec. 2014).

pleasure. *Such regulations of the mode in which the facts constituting guilt may be placed before the jury, can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offence charged.*

*Hopt v. Utah,* 110 U.S. 574, 589–90, 4 S.Ct. 202, 28 L.Ed. 262 (1884) (emphasis added). If such changes to *trial* procedure do not run afoul of the Ex Post Facto Clause, similar changes to Article 32 proceedings—from which no finding of guilt will flow and which are not binding upon the convening authority—also do not. *See Carmell v. Texas,* 529 U.S. 513, 546–47, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (evidence admissibility rules do not go to the general issue of guilt, nor to whether a conviction, as a matter of law, may be sustained).

We therefore conclude, as did the military judge, that application of the new Article 32 to an accused whose hearing was on or after its effective date does not violate the Ex Post Facto Clause because it does not "alter[ ] the definition of an offense or increase its punishment." [10] *Id.* at 49.

### 4. Unlawful Command Influence

As noted above, the PHO followed the direction of the SPCMCA and applied the Guide's Air Force Rules. Because the old R.C.M. 405 had not been rescinded, Appellant argues that no one within the Air Force or Department of Defense was empowered to deviate from that rule and that TJAG's memorandum, the Guide, and the SPCMCA's order constitute unlawful command influence.

Article 37(a), UCMJ, 10 U.S.C. § 837(a), states in relevant part:

No person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

■ The mere appearance of unlawful command influence may be "as devastating to the military justice system as the actual manipulation of any given trial." *United States v. Ayers,* 54 M.J. 85, 94–95 (C.A.A.F. 2000) (internal quotation marks and citation omitted).

The old R.C.M. 405 began with this statement of purpose:

Except as provided in subsection (k) of this rule [which authorizes an accused to waive an Article 32 investigation], no charge or specification may be referred to a general court-martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made in substantial compliance with this rule. Failure to comply with this rule shall have no effect if the charges are not referred to a general court-martial.

R.C.M. 405(a). Rule 405 thereafter set forth rules of procedure and evidence to be followed during the pretrial investigation. Although not part of the rule itself, Rule 405's Discussion further explains its purpose and function:

The primary purpose of the investigation required by Article 32 and this rule is to inquire into the truth of the matters set forth in the charges, the form of the charges, and to secure information on which to determine what disposition should be made of the case. The investigation also serves as a means of discovery. The function of the investigation is to ascertain and impartially weigh all available facts in arriving at conclusions and recommendations, not to perfect a case against the accused. The investigation should be limited to the issues raised by the charges and necessary to proper disposition of the case. The investigation is not limited to examination of the witnesses and evidence mentioned in the accompanying allied papers.

---

**10.** In *Collins v. Youngblood,* Chief Justice Rehnquist noted that although the Supreme Court had previously called "procedural" laws which change the "procedures by which a criminal case is adjudicated, as opposed to substantive changes in the law of crimes," that language has "imported confusion" into the interpretation of the Ex Post Facto Clause and was not the proper analytical framework. 497 U.S. 37, 45, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). To the extent the procedural/substantive distinction still exists (if at all), we conclude that the new Article 32 is procedural rather than substantive.

*See* subsection (e) of this rule. Recommendations of the investigating officer are advisory.

R.C.M. 405(a) (Discussion).

The military judge concluded that the new Article 32 was intended to replace the existing Article 32 in its entirety and create a completely new pretrial process. He also concluded that the old R.C.M. 405 was essentially a "dead-letter rule," that there were no rules for conducting a preliminary hearing, and that convening authorities had the authority to conduct hearings pursuant to the new Article 32. We review de novo these conclusions of law.

The old Article 32 referred to the pre-trial procedure as an "investigation"; the new Article 32 refers to the procedure as a "hearing." The legislative history also reflects Congress' intent to replace "investigations" with substantively-different "hearings" and described the new Article as:

Mak[ing] the Article 32 process more like a grand jury proceeding. Under the UCMJ, the Uniform Code of Military Justice, currently the proceeding that is taken under Article 32 is more like a discovery proceeding rather than a grand jury proceeding, and it has created all kinds of problems, including for victims of sexual assault who would have to appear and be subject to cross-examination by the defense.

Cong. Rec. S. 8548 (December 9, 2013).[11]

In the Joint Explanatory Statement that accompanied the FY14 NDAA, Congress also noted that it was narrowing the scope of the proceeding:

The provision included in the agreement changes Article 32, UCMJ, proceedings from an investigation to a preliminary hearing. Under current law and Rule 405 of the Rules for Court–Martial, an Article 32, UCMJ, investigation includes inquiry into the truth of the matters set forth in the charges, provides a means to ascertain and impartially weigh all available facts in arriving at conclusions and recommendations, and serves as a tool of discovery. The agreement establishes that an Article 32, UCMJ, preliminary hearing has a narrower objective: (1) To determine whether there is probable cause to believe an offense has been committed and the accused committed the offense; (2) Determine whether the convening authority has court-martial jurisdiction over the offense and the accused; (3) Consider the form of the charges; and (4) Recommend the disposition that should be made of the case.

159 Cong. Rec. H7949 (Dec. 12, 2013).

In addition to changing the name of the process and evidencing a desire to change substantively what occurred at that stage of the proceedings, Congress also changed the name of the presiding officer from "investigating officer" to "hearing officer" and changed the qualifications the hearing officer must possess.

 Finally, and perhaps both most importantly and to signify an intent to change the procedure completely, Congress did not simply change words or paragraphs of the old Article 32. Instead, it substituted the entire text of the old Article 32 with the new Article 32.[12] Based on the foregoing, we agree with the military judge that the old Article 32 was effectively repealed and replaced by the new Article 32.

Having determined that the old Article 32 was completely supplanted by the new Article 32, we next must consider whether the old R.C.M. 405 still guided the conduct of the new preliminary hearings. Appellant makes two broad arguments: first, because the President did not rescind the old R.C.M. 405, any provisions that were not inconsistent

---

**11.** *Available at* https://www.gpo.gov/fdsys/pkg/CREC–2013–12–09/pdf/CREC–2013–12–09–pt1–PgS8548–2.pdf#page=1.

**12.** Congress could have repealed the old Article 32 and given the new statute a new designation (*e.g.*, Article 32a or Article 157). While such an approach might have more clearly signified Congress' intent to establish a completely different entity than a pretrial investigation, the result here is the same: the old statute ceased to exist and was replaced by entirely new text. Requiring a new numerical designation to achieve the same result would elevate form over substance. *See McCarthy v. United States*, 394 U.S. 459, 467 n.20, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) ("Matters of reality, not mere ritual, should be controlling.").

with the new Article 32 remained binding upon the PHO; and second, TJAG and the convening authority were without authority to promulgate rules that are either inconsistent with or more broad than those contained in the old R.C.M. 405.

■ As a threshold matter, and for the reasons noted above, we easily conclude that the old R.C.M. 405 applied to "pretrial investigations" held prior to 26 December 2014. No pretrial investigations occurred after that date. Although the old R.C.M. 405 still existed as a rule, the procedure it regulated no longer did. Essentially, as of 26 December 2014, the old R.C.M. 405 had no legal effect.[13]

■ Thus the question becomes: in the absence of a rule establishing procedures for a preliminary hearing, who (if anyone) can fill the void? Article 36, UCMJ, authorizes the President to prescribe "[p]retrial, trial, and post-trial procedures, including modes of proof." 10 U.S.C. § 836(a). Presidentially-created rules must not be inconsistent with the UCMJ.[14] *Id.* Article 36 does not specifically provide for a delegation of this authority.

However, our superior court has held that voids in the procedural rules applicable to trials by courts-martial may be filled other than by Executive Order. *United States v. Vara*, 25 C.M.R. 155, 158 (C.M.A. 1958). Although the *Vara* court said that "the Services could correct the deficiency by appropriate regulations," *id.*, it did not state that individual Service regulations were the only means to fill such a void.

Whatever we make of the legal status of the Air Force Rules promulgated by AF-LOA/JAJM, even the Government does not assert that they were regulations issued under the authority of the Secretary of the Air Force. Similarly, the Government does not argue that the Air Force Rules were issued under the authority of R.C.M. 108 (authorizing Judge Advocates General to promulgate "rules of court" "for the conduct of court-martial proceedings").

While we question the wisdom of calling them "Air Force Rules" when the drafter of the rules (TJAG, through the Military Justice Division) did not assert the authority to implement them, calling them "Rules" does not make them rules in the absence of an order from competent authority to comply with them. In this case, it was the convening authority who ordered the PHO to conduct the preliminary hearing pursuant to the "Air Force Rules."

Absent the prohibition against unlawful command influence, there are no constraints within the UCMJ on the convening authority's power to establish the procedures to be followed during a preliminary hearing. We do not read the absence of such an express grant to mean that the convening authority has unfettered power in this regard, but we do consider whether, when confronted by clear evidence of congressional intent of what a preliminary hearing should be, the convening authority had either the authority or obligation to ensure that the hearing was conducted in accordance with Congress's mandate.

Indeed, the UCMJ already grants the convening authority certain quasi-judicial powers:

> Because a military judge is not appointed to conduct proceedings until charges are referred to a court-martial, the military justice system does not have standing courts at the trial level to address legal issues at the pre-referral stage. The convening authority exercises responsibility for pretrial matters that would otherwise be litigated before a judge in civilian proceedings, including issues involving the conduct of depositions, issuance of protective orders, availability of government-

---

13. Our holding in this regard is that the old R.C.M. 405 establishes procedures for a proceeding that does not exist after the effective date of the new Article 32. We may decide this case on that basis or that the old R.C.M. 405 conflicts with the new Article 32; *see United States v. Davis*, 33 M.J. 13, 15 (C.M.A. 1991) (invalidating R.C.M. 1105 because it conflicted with Article 60(b)(1), the result is the same).

14. Article 36's prohibition on Presidentially-created rules conflicting with the UCMJ provides yet another reason to conclude that the old R.C.M. 405 does not apply to preliminary hearings. The old R.C.M. 405 contained procedures that were inconsistent with the new Article 32's limitations.

funded experts, mental responsibility proceedings, and questions concerning the validity of charges. *See, e.g.,* Article 34, UCMJ, 10 U.S.C. § 834 (2000); R.C.M. 405(g)(6), 406, 407, 702(b), 703(d), 706(b)(1). *United States v Wiechmann,* 67 M.J. 456, 461 (C.A.A.F. 2009). The convening authority also has the power in his sole discretion to exclude periods of pretrial delay from speedy-trial accountability. R.C.M. 707(c).

Moreover, although we have determined that these rules did not exist at the time of Appellant's preliminary hearing, we note that both the old and new versions of R.C.M. 405 specifically grant the convening authority the power to establish "procedural instructions not inconsistent with these rules." R.C.M. 405(c). Thus, the convening authority's direction that the PHO use the Air Force Rules was not inconsistent with Presidential intent under either the old or new R.C.M. 405.

The convening authority was directed by Congress to order a preliminary hearing before referring charges to trial by general court-martial. At the time of Appellant's hearing, there were no congressionally- or presidentially-directed procedural rules for such a hearing. Although the hearing was directed by statute, it was purely advisory and designed to assist the convening authority perform his duties under R.C.M. 601.

We conclude that the SPCMCA had the authority to establish procedural rules for the preliminary hearing and his direction in this case was within the scope of that authority. Our holding should not be read more broadly than is intended. We do not conclude that a convening authority may generally promulgate or supplement rules affecting the court-martial process; to the contrary, the presidentially-directed Rules for Courts–Martial will infrequently be construed to leave a "void in the field which should be filled." *Vara,* 25 C.M.R. at 158. However, this is exactly such a case.

Having concluded that the SPCMCA acted within his authority in establishing procedural rules for the conduct of the preliminary hearing, we also reject the argument that unlawful command influence invaded this process. The military judge found, and we agree, that Appellant presented insufficient evidence to shift the burden to the Government to disprove the existence of unlawful command influence. There is no evidence that TJAG, the convening authority, or anyone else engaged in conduct intended to influence the action of the court-martial in reaching the findings or sentence in this case, nor is there any evidence of apparent unlawful command influence.

## B. Application of Mil. R. Evid. 413

Appellant asserts that Mil. R. Evid. 413 is unconstitutional as applied to him and, in the alternative, that the military judge erred when he instructed the members that they could use the charged sexual assault offenses as propensity evidence. We first review the history of Mil. R. Evid. 413 and its application.

Congress approved Federal Rules of Evidence (Fed. R. Evid.) 413–15 as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, Title XXXII, § 320935(a). Mil. R. Evid. 413 was adopted from Fed. R. Evid. 413 and the Manual for Courts–Martial analysis of Rule 413 references the legislative history and congressional intent in enacting Fed. R. Evid. 413. *United States v. Berry,* 61 M.J. 91, 95 n.2 (C.A.A.F 2005).

The rule states that in cases involving alleged sexual assault, evidence of other sexual offenses by the same accused is admissible and may be considered for its bearing on "any matter to which it is relevant." Mil. R. Evid. 413(a). Citing the congressional record and the Manual's analysis, the Court of Appeals for the Armed Forces (CAAF) has held that this includes admission for purposes of demonstrating the accused's propensity to commit the charged offenses. *United States v. Parker,* 59 M.J. 195, 198 (C.A.A.F. 2003); *United States v. Wright,* 53 M.J. 476, 480 (C.A.A.F. 2000).

Faced with attacks similar to Appellant's, the CAAF has held that Mil. R. Evid. 413, when subject to a Mil. R. Evid. 403 balancing test and proper instructions, is constitutional. *Wright,* 53 M.J. at 482–83. The CAAF has also held that evidence of an offense to which

an accused has pleaded guilty or been found guilty can be admitted and considered under Mil. R. Evid. 413 to show propensity to commit the sexual assaults to which he pleaded not guilty, *id.*, and that uncharged sexual assaults that occurred after the charged offenses are admissible under Mil. R. Evid. 413, *United States v. James*, 63 M.J. 217, 218 (C.A.A.F. 2006).

None of these cases directly addressed the question of whether evidence of one charged offense of sexual assault could be used as propensity evidence with respect to another charged offense of sexual assault. Each service appellate court that considered the issue, however, held that using charged conduct as propensity evidence with respect to other charged conduct was proper.[15]

In *Hills*, the CAAF was confronted by a situation in which the military judge allowed the Government to do just that, but in *Hills* all of the charged offenses were against the same victim. 75 M.J. 350. The CAAF held that Mil. R. Evid. 413 did not apply because the evidence of each charged assault was already admissible (and thus did not need to rely on Mil. R. Evid. 413 as a theory of admissibility) and that the military judge erred in instructing the members that if they found by a preponderance of the evidence that Hills committed a sexual assault they could use evidence of that offense to find Hills guilty of the other sexual assault offenses beyond a reasonable doubt. *Id.* at 354–55. Notably, the CAAF did not address or specifically overrule the prior service court decisions allowing charged conduct to be considered as propensity evidence.

*Hills*—and military trial and appellate courts' efforts to understand and implement its holding—has generated significant litigation. Perhaps one of the reasons for this is imprecision in language (including our own) conflating two related, but distinct, issues: the admissibility of evidence and the proper

use of evidence once admitted. Some rules of evidence are rules of admissibility only and do not state how such evidence may be used. Some are rules of exclusion. Yet others are both rules of admissibility and prescriptions for use of the evidence. Mil. R. Evid. 413 is of the latter quality: it sets standards for admissibility of otherwise-inadmissible evidence and provides direction on how the evidence may be used.

Before analyzing Appellant's case, and recognizing that we do not write on a blank slate, we first restate what we believe to be the current law with respect to charged and uncharged [16] evidence in sexual assault cases:

Admissibility of uncharged (and otherwise-inadmissible uncontested charged) conduct: Mil. R. Evid. 413 (subject to a Mil. R. Evid. 403 balancing test) is the standard by which a trial judge determines the admissibility of this evidence.

Admissibility of charged (contested) conduct: Evidence of charged conduct is already independently admissible and thus does not require a separate rule to authorize its admission. Therefore, cases interpreting and applying Mil. R. Evid. 413 are not relevant to the admissibility of charged conduct.

■ Use of evidence admitted under Mil. R. Evid. 413: If evidence of uncharged sexual offenses (or otherwise-inadmissible charged conduct) is admitted pursuant to Mil. R. Evid. 413, the trier of fact may use that evidence (and should be instructed accordingly, if a members trial) on any matter to which it is relevant.

■ Use of evidence of charged (contested) conduct: Ordinarily "an accused must be convicted based on evidence of the crime before the court, not on evidence of a general criminal disposition." *United States v. Hogan*, 20 M.J. 71, 73 (C.M.A. 1985). However, if evidence has been presented that is relevant to more than one offense, the trier of

15. *United States v. Barnes*, 74 M.J. 692 (A. Ct. Crim. App. 2015), *pet. den.*, 75 M.J. 27 (C.A.A.F. 2015); *United States v. Bass*, 74 M.J. 806 (N–M. Ct. Crim. App. 2015); *United States v. Maliwat*, ACM 38579 (A.F. Ct. Crim. App. 19 Oct. 2015) (unpub. op.)., 2015 WL 6655541

16. The distinction between "charged" and "uncharged" conduct is another example of imprecision in our prior language, as we know that charged conduct to which an accused pleads guilty can be admissible as Mil. R. Evid. 413 propensity evidence in the same case. *See Wright*, 53 M.J. 476.

fact may consider that evidence with respect to each offense to which it is relevant. *United States v. Vela*, 71 M.J. 283, 286 (C.A.A.F. 2012). A military judge should therefore provide instructions appropriate to the facts and evidence in an individual case. See DA Pam 27–9, § 7–17 (Spill-over instruction).

■ We now turn to Appellant's case. As noted above, all of the evidence at issue was admissible as charged conduct without regard to Mil. R. Evid. 413. We, therefore, need not separately address whether Mil. R. Evid. 413 is constitutional as applied to Appellant because it is inapplicable to Appellant's case.

What remains is an analysis of how the members were allowed to *use* the properly-admitted evidence. The military judge provided the following instruction to the members:

Evidence that the accused committed a sexual offense alleged in a specific specification may have no bearing on your deliberations in relation to the other sexual offense allegations unless you first determine by a preponderance of the evidence, that it is more likely than not, the offense alleged in that specific specification and charge occurred, even if you are not convinced beyond a reasonable doubt that the accused is guilty of that offense, you may nonetheless then consider the evidence of that offense for its bearing on any other matter to which it is relevant in relation to the other sexual offenses in this case. You may also consider the evidence of that sexual offense for its tendency, if any, to show the accused's propensity or predisposition to engage in sexual offenses. You may not, however, convict the accused solely because you believe he committed this other offense or solely because you believe the accused has a propensity or predisposition to engage in sexual offenses. In other words, you cannot use this evidence to overcome a failure of proof in the government's case, if you perceive any to exist. The accused may be convicted of an alleged offense only if the prosecution has proven each element beyond a reasonable doubt. Each offense must stand on its own and proof of one offense carries no inference that the accused is guilty of any other offense. In other words, proof of one sexual offense creates no inference that the accused is guilty of any other sexual offense. However, it may demonstrate that the accused has a propensity to commit that type of offense.

■ This instruction is not meaningfully distinguishable from the instruction found constitutionally erroneous in *Hills*, 75 M.J. at 356. Whether a panel was properly instructed is a question of law we review de novo, and we evaluate a military judge's instructions in the context of overall message conveyed to the members. *Id.* at 357 (quotation marks and citations omitted); *United States v. Medina*, 69 M.J. 462, 465 (C.A.A.F. 2011) (citing *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008)). Here, "because there are constitutional dimensions at play, [the error] must be tested for prejudice" under a harmless beyond a reasonable doubt standard. *Hills*, 75 M.J. at 357 (alteration in original) (citation and internal quotation marks omitted). In answering this question, we consider the entire record. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

■ The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is "whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence. An error is not harmless beyond a reasonable doubt when there is a reasonable possibility that the [error] complained of might have contributed to the conviction." *Hills*, 75 M.J. at 357–58 (internal citations and quotations omitted).

In reversing Hills' conviction for instructional error, the CAAF noted that the "juxtaposition of the preponderance of the evidence standard with the proof beyond a reasonable doubt standard with respect to the elements of the same offenses would tax the brain of even a trained lawyer." *Id.* at 358. The CAAF also suggested, however, that the strength of the government's case or our ability to determine whether "the instructions may have tipped the balance" could

render harmless beyond a reasonable doubt the erroneous instruction. *Id.*

At trial, Appellant faced seven specifications under Article 120, UCMJ. He was charged with penetrating EW's vulva with his penis by using unlawful force in July 2014. He was charged with penetrating A1C KJ's vulva and anus with his penis on 31 August 2014. He was also charged with penetrating A1C KJ's vulva, anus, and mouth with his penis, as well as penetrating her anus with a sex toy on 4 September 2014. He was convicted of the EW specification, found not guilty of the 31 August 2014 conduct, and convicted of the lesser-included offenses of sexual assault with respect to each of the 4 September 2014 specifications.

The victims' testimony was powerful. There is no evidence that they had met prior to the investigation or colluded or even discussed their testimony. They described very similar sexual assaults both in the lead-up and commission. Both testified that Appellant referred to them using the same unusual, vulgar phrase and asked that they write it on their bodies.

However, the evidence was not free from conflict. There was no physical evidence of damage to EW's door. Although a sexual assault nurse examiner testified that she saw signs of vaginal trauma in A1C KJ's post-incident examination, there is no trauma evident on photographs taken contemporaneously. Both women at various times indicated a willingness to engage in lightly rough sex and both from time to time replied to Appellant's sexually-charged vulgar banter. Both relationships appeared to be about little more than sex.

Appellant admitted that his relationships with EW and A1C JK frequently involved anal sex, rough sex, and choking, but said that if a partner was not enjoying what was happening, "we would stop or change positions or however that works." He denied entirely the incident with EW.

With respect to A1C JK, Appellant testified that they had consensual, vaginal intercourse; that A1C JK was on top of him throughout; and that there was no choking or any conduct that could be considered "rough." He testified that A1C JK gave no indication that she was anything other than a willing participant. Appellant testified that the next day, as he and A1C JK were sitting on the couch, he was able to read text messages she was sending to other men and made up a story about having to go to a barbecue to get her to leave his house. He also admitted later sending A1C JK a text message to the effect of, when "you're done with all those guys, let me know." Appellant denied knowing that A1C JK had blocked his phone number and said that his visit to her house to retrieve the sex toy was pre-arranged with A1C JK. He denied demanding intercourse from her, but admitted that they did in fact engage in oral, vaginal, and anal sex, and admitted that he inserted the toy into A1C JK's anus, but at her request. Appellant also admitted that he asked A1C JK while they were dating whether she would let him choke her, give her a bloody nose, and slap her (with both closed and open fists).

The harmless beyond a reasonable doubt standard requires that we be convinced there is no reasonable possibility the erroneous instruction might have contributed to the conviction. This case turned largely on credibility and resulted in mixed findings with respect to both alleged victims. The test is not whether we ourselves believe the evidence was sufficient to prove Appellant's guilt; the test is whether the instructions may have tipped the balance. We cannot say beyond a reasonable doubt the instructions did not, and we are, therefore, compelled to set aside the findings with respect to the Article 120, UCMJ, offenses.[17]

## C. Conditions of Post–Trial Confinement

■ Appellant asserts that he was held in a civilian confinement facility "in effectively

---

**17.** Our resolution of this issue moots Appellant's argument that the evidence was not factually or legally sufficient to sustain the conviction for the Article 120, UCMJ, offenses. We have considered Appellant's arguments that the evidence is not legally or factually sufficient to sustain his remaining convictions but find them without merit. *United States v. Matias,* 25 M.J. 356 (C.M.A. 1987).

isolation conditions" for five days until he was transferred to a military confinement facility. In a declaration submitted with his assignments of error, Appellant claims that he was held in the maximum-security section of the facility to prevent him from being commingled with civilian prisoners, was confined to his cell, "had no attorney phone calls," and was allowed to leave his cell only once for a shower. Appellant provided no evidence he complained about the conditions of his confinement while in the civilian confinement facility. The Government provided declarations from three different individuals in support of the fact that there is no record of a grievance or official complaint from Appellant regarding the conditions of his confinement.

 Notably, Appellant does not claim that the conditions of his brief stay in civilian confinement constitute cruel and unusual punishment in violation of the Eighth Amendment or Article 55, UCMJ. Rather, he argues that we should grant relief under our broad Article 66(c), UCMJ, 10 U.S.C. 866(c), authority to approve only so much of the sentence that is just and appropriate. *See United States v. Gay*, 74 M.J. 736 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). As the CAAF noted, however, we do not have unlimited authority to grant sentence appropriateness relief for any conditions of post-trial confinement of which we disapprove; our decision in *Gay* was authorized by Article 66(c) because it was based on a legal deficiency in the post-trial process. *Gay*, 75 M.J. at 269.

 Under Eighth Amendment and Article 55, UCMJ, jurisprudence, a prisoner must seek administrative relief prior to invoking judicial intervention to redress concerns regarding post-trial confinement conditions. *United States v. White*, 54 M.J. 469, 472 (C.A.A.F. 2001). This generally means that the prisoner will have exhausted the detention center's grievance system and peti-

tioned for relief under Article 138, UCMJ. We have not established such a requirement for exercising our Article 66(c) powers, and we do not do so today, but we do believe that failure to complain about the conditions of post-trial confinement is a factor which bears significant weight on whether we should use our equitable power to disapprove a sentence to confinement.

 Even accepting Appellant's factual allegations as true, lack of human interaction and restriction upon movement, while unpleasant, are conditions generally attendant to post-trial confinement. The brevity of his stay in civilian confinement, the lack of egregiousness of the alleged conditions, and his failure to seek redress at the time, do not rise to the level of the conditions in *Gay*. We do not believe sentence relief is warranted in this case.

### III. Conclusion

The findings of guilty of Charges II and III, in violation of Articles 128 and Article 134, UCMJ, and their specifications, are **AFFIRMED**.[18] The findings of guilty of Charge I and Specifications 1, 5, 6, 7, and 8, in violation of Article 120, UCMJ, and the sentence are **SET ASIDE**. The record is returned to TJAG for remand to the convening authority who may order a rehearing on Charge I, Specifications 1, 5, 6, 7, and 8, and the sentence or take other discretionary action under R.C.M. 1107(e)(1)(B). Upon completion of the convening authority's subsequent action, the case shall be returned to this court for further review. *United States v. Johnson*, 45 M.J. 88, 89–90 (C.A.A.F. 1996).

---

18. While mooted by our action, we note that the court-martial order fails to reflect that Specifica-

tion 2 of Charge I was withdrawn and dismissed after arraignment.