# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 38886 (reh)**

————————————

**UNITED STATES**
*Appellee*

v.

**Michael R. HENRY**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 January 2020

————————————

*Military Judge:* L. Martin Powell.

*Approved sentence:* Bad-conduct discharge, confinement for 12 months, and reduction to E-4. Sentence adjudged 5 March 2018 by GCM convened at Dover Air Force Base, Delaware.

*For Appellant:* Major Meghan R. Glines-Barney, USAF; Major Mark J. Schwartz, USAF; Robert A. Feldmeier, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, J. JOHNSON, and KEY, *Appellate Military Judges*.

Chief Judge MAYBERRY delivered the opinion of the court, in which Senior Judge J. JOHNSON and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

MAYBERRY, Chief Judge:

In 2015, a general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of rape, assault consummated by a battery by squeezing EW's neck, and communicating threats to EW, and sexual assault by penetrating the vulva, anus, and mouth of Airman First Class (A1C)

KJ with his penis and penetrating her anus with a sex toy, in violation of Articles 120, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928, 934.[1] The adjudged and approved sentence at this trial was a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to the grade of E-1. On 17 February 2017, we affirmed the findings of guilt as to the Article 128 and Article 134 offenses but set aside the findings of guilt as to the Article 120 offenses and the sentence, and authorized a rehearing. *United States v. Henry (Henry I)*, 76 M.J. 595 (A.F. Ct. Crim. App. 2017), *rev. denied without prejudice*, 76 M.J. 431 (C.A.A.F. 2017).

A rehearing on the Article 120 offenses (Charge I) and sentencing was held and concluded on 5 March 2018. A general court-martial composed of officer members found Appellant not guilty of the Article 120 offenses, and adjudged a sentence for the Article 128 and 134 offenses of a bad-conduct discharge, 12 months confinement, reduction to the grade of E-4, and a reprimand. The convening authority disapproved the reprimand, but approved the remaining components of the adjudged sentence.

Appellant asserts three assignments of error: (1) the proof for the Article 128 and Article 134 offenses is factually insufficient in light of Appellant's acquittal at the rehearing and in light of new evidence adduced at the rehearing; (2) a disqualified trial counsel's involvement in the rehearing requires the findings to be set aside, the sentence to be set aside, or both; and (3) whether Appellant is entitled to additional Article 13, UCMJ, 10 U.S.C. § 813, credit against his sentence. We find no prejudicial error and affirm.[2]

## I. BACKGROUND

The rehearing was hotly contested, involving 11 days on the record. There were 15 motions filed by the Defense, both before and during the rehearing, involving *inter alia* prosecutorial misconduct regarding discovery, inappropriate actions by the former assistant trial counsel, and inappropriate actions by

---

[1] *See Manual for Courts-Martial, United States* (2012 ed.), pt. IV, ¶ 45.a.(a)(1); ¶ 45.a.(b)(1)(B); ¶ 54.b.(2); ¶ 110.b. Unless otherwise stated, all other references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial, and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] We note that the case was not docketed with the court within 30 days of Action, which is an unreasonable delay pursuant to *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). Appellant does not raise the issue and consequently has not asserted a due process violation or prejudice, and we find none. *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We determine that the delay does not merit relief. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002).

the current circuit trial counsel, all of which related to the rehearing. Pretrial matters compose just under one-half of the 1,582-page transcript. One of the named victims, EW, was unwilling to participate in the rehearing until two weeks prior to the scheduled start date, five months after Appellant was arraigned. This fact, along with contested discovery allegations, is integral to our analysis of the errors Appellant alleges.

EW was a reluctant participant from the outset. She did not report any of the allegations to law enforcement, but was contacted by AFOSI after the other named victim reported her allegations. For the first trial, the assistant trial counsel, Captain (Capt) Z, was the primary contact with EW after the original charges were preferred. Two weeks prior to commencement of the first trial, Defense filed a motion to have Capt Z disqualified based on access to privileged attorney-client communications as a result of her review of phone records extracted from Appellant's cell phone by AFOSI.[3] Unbeknownst to Capt Z, those records contained attorney-client communications. Capt Z provided an affidavit at the original trial asserting "I did not read the content of any text message and I did not search for any email communications. I neither found nor reviewed any attorney-client communications." Although the military judge found no willful misconduct on Capt Z's part, the military judge granted the defense motion. Capt Z was removed from the prosecution team and did not participate in the first trial.

Appellant was represented by civilian and military defense counsel at his first trial. At the rehearing, he was represented by a different civilian counsel and a different military defense counsel.

## II. DISCUSSION

### A. Impact of Rehearing on Previously Affirmed Findings due to Newly Discovered Evidence and Acquittal at Rehearing.

Appellant asserts the court should set aside and dismiss the previously affirmed convictions for assault consummated by a battery and communication of a threat (Charges II and III) because the evidence was factually insufficient. Alternatively, Appellant asserts the court should dismiss the charges and sentence or the sentence alone because "new evidence adduced at the rehearing destroyed EW's credibility and disproves her account of the events surrounding the offenses." The Government disagrees and so do we.

---

[3] There were additional allegations involving the seizure and search of the phone, requests for other personnel to be disqualified, and a request that the phone be returned to Appellant. The extraction was not done in relation to the charged offenses and there were no issues surrounding the phone raised on initial appellate review.

Generally, Appellant is only entitled to one plenary review under Article 66, UCMJ, 10 U.S.C. § 866. In *Henry I*, we affirmed the factual sufficiency of the assault consummated by a battery and communication of a threat convictions. Ordinarily, we would decline to revisit this issue. However, we choose to revisit the factual sufficiency of the previously affirmed offenses based on the unique facts and circumstances involved in this case. Having considered all of the evidence presented, we find that the impact of the evidence adduced at the rehearing was not significantly different, and our original decision finding Appellant's contention that the evidence is not legally or factually sufficient to sustain these convictions to be without merit was neither clearly erroneous nor a manifest injustice.

### 1. Additional Background

In 2015, Appellant was initially charged with two specifications of rape involving EW, occurring approximately a week apart. Prior to arraignment, the Government withdrew the second specification. EW did not participate in the Article 32, UCMJ, 10 U.S.C. § 832,[4] preliminary hearing, but rather her videotaped interview with AFOSI was offered in accordance with the applicable procedures. EW initially did not want to participate in the original trial, but ultimately did so.

At the original trial, defense counsel did not directly confront EW about the withdrawn offense, but the cross-examination did elicit evidence about that incident; including that when EW initially agreed to be interviewed by the Defense the week before trial, she brought a representative from the legal office with her; her memory had changed about some of the interactions with Appellant; and on the occasion after this second rape incident, she spent time together with Appellant and portions of the night were pleasant. In the original appellate review, Appellant did not robustly challenge the legal and factual sufficiency of the non-sexual offenses. Instead, he made a generic reference to the sufficiency of the evidence on those charges, relying on his counsel's findings argument that there was no corroborating evidence and the complaining witnesses (including EW) were not credible.

EW was not willing to participate in the rehearing until a few weeks before the rehearing was scheduled to start. Less than a week after learning EW would participate, the Defense requested discovery related to the dismissal of the second rape specification. The next day, the Government replied that they

---

[4] *See Manual for Courts-Martial, United States* (2012 ed.).

had no information or documents responsive to this request.[5] One week later, the Defense filed a motion requesting appropriate relief due to the loss or destruction of "exculpatory" evidence. The crux of the motion was that four days before the rehearing, the Defense did not know whether EW recanted portions or all of the allegations for the second incident and/or stated the allegations were false in part or in full. The Defense asserted EW made a statement to the prosecution days before trial and no interview notes had been provided in discovery. Appellant claimed the loss or destruction of those interview notes prevented a fair trial and requested that the remaining specification of rape be dismissed.

At a motions hearing conducted before the rehearing, one of the trial counsel and the government case paralegal who interviewed EW just before the original trial were called as witnesses. Both had only a vague recollection of EW saying something in the interview just before trial that gave them cause to believe there was not a crime in that specification. While both of them acknowledged taking notes during the interview, they did not know the whereabouts of those notes. A thorough review of the office case file, hard copy and electronic, was made and no such notes were found. The former assistant trial counsel fully understood the obligations under *Brady v. Maryland*, 373 U.S. 83, 88 (1963), to disclose exculpatory evidence and testified that he would have turned over any exculpatory evidence in accordance with his discovery obligations.

EW was also called by the Defense to testify at the motions hearing. She only recalled discussing this allegation with the original trial defense counsel, not the prosecution. On cross-examination, EW confirmed that when the civilian defense counsel was questioning her about the second incident, she concurred that she told them "[t]hat's not how it went down." When questioned by the military judge, EW stated that when she was speaking with the defense counsel regarding the second incident, "it was worded to me like it was a forceful situation on like [Appellant's] part, and it wasn't, the second incident was not." When asked by the military judge if, from her perspective, she had been consistent with her description of the second event all along and maybe it somehow got misinterpreted, EW said yes.

The Defense at the rehearing asserted they only learned of the reason why the specification was withdrawn when they interviewed the former members of the prosecution team, and then confirmed it when they spoke to EW days

---

[5] Initially the assistant trial counsel did not recall a specification being withdrawn, but after having an opportunity to review the charge sheet from four years earlier his recollection was refreshed.

before the rehearing. At the original trial, Appellant's defense counsel emphasized the fact that EW brought "a representative from the legal office" with her to the defense interview during cross-examination. While the record is void of any information as to who that individual was, the evidence is undisputed that representatives from both parties were present during the Defense pretrial interview of EW.

The military judge ultimately denied the motion, noting there was no evidence that the Government had failed to provide exculpatory evidence in discovery. Furthermore, there was evidence that EW admitted then, and admits now, that the second incident did not involve rape, which must necessarily be somewhat inconsistent with other evidence that led to the referral of the second rape specification involving EW. The military judge ruled the Defense would have the full ability at the rehearing to explore all issues arising from any such inconsistency.

During the presentation of the defense case at the rehearing, Capt Z was called as a witness. Defense counsel inquired about statements made by EW regarding the second incident, and asked Capt Z if she recalled sending an email to the prior defense attorneys on 30 March 2015 regarding the rape specification that was withdrawn prior to the original trial. When Capt Z indicated she did not specifically recall that, counsel showed her the email, marked as Defense Exhibit H for identification. After multiple objections regarding the admissibility of the exhibit, Capt Z acknowledged that she "had to send this disclosure to the defense, because it was in some way inconsistent" with EW's prior statements.

### 2. Law

While Appellant is entitled to plenary review under Article 66, UCMJ, he is only entitled to one such review. *United States v. Smith*, 41 M.J. 385, 386 (C.A.A.F. 1995).

Under the law-of-the-case doctrine, a court should not normally reconsider a decision unless it was "clearly erroneous and would work a manifest injustice." *See United States v. Riley*, 50 M.J. 410, 420 (C.A.A.F. 1999) (Crawford, J., dissenting) (quoting *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817 (1988)). In other words, a court's decision on a rule of law should continue to govern the same issues in later stages of the case. *Arizona v. California*, 460 U.S. 605, 618 (1983).

The law-of-the-case doctrine, however, is a matter of appellate policy, not a binding legal doctrine. Because the law-of-the-case doctrine is discretionary, it need not be applied when the lower court's decision is "clearly erroneous and would work a manifest injustice." *United States v. Parker*, 62 M.J. 459, 464–65 (C.A.A.F. 2006) (citation omitted).

### 3. Analysis

Appellant asserts that because he was acquitted of the Article 120 offense involving EW at the rehearing, the previously affirmed convictions for assaulting her and communicating a threat to her must be set aside. Furthermore, Appellant asserts that the record available for this court's consideration is not limited to the original record, and the previous opinion affirming these charges "is not relevant" to the present analysis based upon the record as it now exists citing *United States v. Hopkins*, 2018 CCA LEXIS 254, at *3 (A. Ct. Crim. App. 25 May 2018), *rev. denied without prejudice*, 78 M.J. 130 (C.A.A.F. 2018).

The original *Hopkins* Court of Criminal Appeals (CCA) opinion summarily affirmed the findings and sentence after the case was submitted on its merits along with *Grostefon*[6] matters. *See United States v. Hopkins*, 2017 CCA LEXIS 431, at *2 (A. Ct. Crim. App. 26 Jun. 2017) ("On 2 February 2016, we summarily affirmed the findings and sentence of appellant's court-martial."). The United States Court of Appeals for the Armed Forces (CAAF) set aside the original CCA opinion and remanded the case for further appellate inquiry as to an allegation of ineffective assistance of counsel. *United States v. Hopkins*, 75 M.J. 338 (C.A.A.F. 2016) (mem.). In that remand order, the CAAF did include the language "the court will complete its Article 66(c), UCMJ, review." *Id.* Appellant's reliance on the post-CCA remand opinion in *Hopkins* is misplaced because it fails to account for the fact that the original CCA opinion was set aside, which is not the case here.

While it is true that the events in Charges I, II, and III regarding EW occurred on the same date during the summer of 2014, Charges II and III were not presented to the members for findings at the rehearing. Consequently, the mere fact that the members at the rehearing found Appellant not guilty of the sexual offense in Charge I does not negate the previous findings of guilt on the other offenses made by different members who heard different evidence—including the testimony of Appellant. Appellant acknowledged that his relationship with EW was dramatic, with a cycle of "loving each other to hating each other to [having] make-up sex." He went on to state that he went to EW's house on two Fridays in July of 2014 and both times they had sex. Appellant denied assaulting or threatening EW during the first incident. Appellant also volunteered that they did not fight in person because seeing her upset made him upset and if she cried, the argument would end. He would fight with EW via text messages, and Appellant acknowledged in doing so he did not have to see the hurt in her face, the upset, or hear her voice when she was crying.

---

[6] *United States v. Grostefon*, 12 M.J. 431 (C.MA. 1982).

EW's credibility was an issue that was addressed head on at the original trial and the rehearing. While EW's involvement at the rehearing was only confirmed at the last minute, it is reasonable, if not expected, that the current defense team would have familiarized themselves with her prior testimony on the merits, which is only 56 pages in length. We reviewed the testimony prior to our original opinion and again for this appellate review.

Having examined the record of trial and making allowances for not having personally observed the witnesses, we find the decision of a previous panel of this court was neither clearly erroneous nor worked a manifest injustice. *Parker*, 62 M.J. at 464–65. In light of the alternative theories as to why the previously affirmed convictions should be dismissed, we will address the facts and circumstances surrounding the participation of the disqualified prosecutor.

## B. Impact of Rehearing on Previously Affirmed Findings due to Participation by Previously Disqualified Trial Counsel

Appellant's second theory as to why the previously affirmed findings should be dismissed is based on the involvement of Capt Z, "a disqualified trial counsel," in the preparation of EW for the rehearing. Specifically, Appellant asserts that Capt Z had "previously read [Appellant's] privileged attorney-client statements" and "provided EW with legal information, analysis and encouragement" based upon Capt Z's own case preparation from the original trial which "included access to appellant's privileged attorney-client communications." Appellant posits that EW would not have participated in Appellant's rehearing and would not have provided a victim impact statement but for Capt Z's assessment of the case because the cumulative effect of Capt Z's misconduct undermined the public perceptions of the fairness of the military justice system. The basis for this argument is a motion filed at the rehearing alleging prosecutorial misconduct by a number of different people on the prosecution team, both at the original trial and the rehearing. Finally, Appellant asserts this court should set aside at least the sentence because Appellant was prejudiced due to EW's victim impact statement being improperly procured.

On appeal, the Government asserts that Appellant waived this issue in so much as the initial verbal motion alleging prosecutorial misconduct at the rehearing involved a comment made by the senior trial counsel to Appellant during a recess of the rehearing.[7] That motion was denied by the military judge. With regard to the later written motion [AE LXIV] which will be discussed below, Capt Z was only mentioned once, involving her instructions to AFOSI

---

[7] This involved an incident where Appellant and the senior trial counsel were entering the restroom on a recess and when Appellant offered to wait until the senior trial counsel was finished, the senior trial counsel indicated "You're not going to shank me, are you? (or words to that effect)."

to not continue to interview additional witnesses regarding the allegations made by the other complaining witness. Alternatively, the Government argues that Capt Z did not participate in the prosecution of Appellant and therefore she could not commit prosecutorial misconduct.

### 1. Additional Facts

#### a. Findings

When EW learned the convening authority referred the previously set aside offenses for rehearing, she indicated she did not want to participate. Appellant was arraigned on 1 September 2017, and the military judge set a deadline of 15 September 2017 for the Government to provide notice as to the status of EW's participation. On 18 September 2017, the Government notified the military judge and the Defense that EW would not participate in the trial. Ten days later, the Government informed the military judge and the Defense that EW would be participating.

On 11 October 2017, four days prior to the next scheduled court session, the Defense filed their notice of anticipated witnesses including 12 for motions, 19 for findings and 2 for pre-sentencing—a total of 29 individuals. No prior requests for witnesses had been submitted for 27 of these witnesses (two expert witnesses having been previously approved). On 12 October 2017, the Government denied all but the previously approved expert witnesses. On 13 October 2017, the Defense filed a motion to compel production of these witnesses, but only one witness is relevant for this issue. Capt Z, then a defense counsel on the west coast and preparing to separate from active duty, was listed as a findings witness who would "provide relevant testimony about [EW's] motives to fabricate to include potential gains/benefits that she was promised by and/or received from Air Force officials for again participating in the prosecution of [Appellant] after [EW] repeatedly told prosecutors that she was not interested in participating in this re-hearing."

Capt Z testified telephonically during an Article 39(a), 10 U.S.C. § 839, session held on 16 October 2017 on the motion to compel. Capt Z stated that she had spoken to EW ten days to two weeks earlier and that prior to that conversation, she last spoke to EW approximately two years earlier, when findings were announced in the original trial. Capt Z explained that her recent contact with EW was based on a request from the assistant trial counsel, asking if she would be willing to speak with EW to discuss the rehearing and see if EW would be willing to participate.

Capt Z testified that she did not specifically recall if she was told that EW was declining to participate or was hesitant to participate. Capt Z's initial contact via text message focused on reintroducing herself to orient EW to who was sending the message, which she summarized as "I prosecuted the case a couple

years ago and . . . I don't know if you heard, but [Appellant's] up for a retrial . . . I asked if she was willing to chat about whether she wanted to participate and what her rights actually were with respect to his new trial." According to Capt Z, EW texted her back immediately and said she did not want to participate, to which Capt Z replied that she understood that and asked if she wanted to chat. EW said yes and Capt Z called her.

Capt Z testified that she generally recalled telling EW that the Government's case was not as strong if she did not participate, and may have asked EW if she remembered all of the other individuals who had made allegations against Appellant that were too scared to come forward, which EW did remember. Capt Z testified that she may have told EW the case would be weaker without her; two people saying something is just more believable than one; and an acquittal is more likely without her. Lastly, Capt Z testified that she told EW that if she wanted a special victim's counsel she had a right to one, EW could inform the trial counsel of that, and Capt Z encouraged EW to participate in the defense interview. On cross-examination, Capt Z denied making any promises to EW, and denied listing any gains or benefits EW might obtain as a result of testifying, such as "transitional compensation or something of that variety."

EW acknowledged the conversation with Capt Z, but did not recall all of the specifics regarding the conversation. On cross-examination, EW testified it was not that phone call that changed her mind about participating in the rehearing. She stated she had been thinking about it, but "wasn't ready to say yes yet" when Capt Z called.

The rehearing resumed on 26 February 2018 with motions and voir dire. That morning, trial counsel provided discovery which included AFOSI Internal Data Pages records. After the court failed to seat a complete panel (excusals reduced the court members below the required quorum), later that evening trial counsel provided discovery consisting of a disk with more than 500 files from AFOSI containing information which had not been provided to the original defense team prior to the 2015 trial. A panel was successfully seated on 28 February 2018, and the presentation of evidence was set to begin the following day. Instead, a defense motion to dismiss or for appropriate relief became the focus of the trial. A number of allegations were included in this motion involving the aforementioned untimely discovery. The relief requested in the motion was for all charges to be dismissed, or alternatively the maximum punishment be capped at "no punishment."

The military judge ruled that the Government was negligent, bordering on demonstrating a reckless disregard for the rights of Appellant, with respect to discovery in this case. The military judge went on to hold that had the evidence been more damning to the Government's case or helpful to Appellant's case,

the court may well have considered dismissing all charges. Regarding the allegation that members of the legal office, including Capt Z, told AFOSI not to interview any more witnesses, the military judge interpreted this as the counsel trying to avoid excessive rabbit holes—more concerned with getting to trial in a timely manner. Additionally, the military judge was not convinced the evidence that had now been disclosed would have been enough to alter the outcome of the original trial so dismissal was too drastic. He indicated he would grant a continuance if necessary; give leeway on cross-examination; and allow former members of the prosecution to be questioned as hostile witnesses.

The military judge indicated he would consider "no punishment" if Appellant was acquitted in this trial. After the findings of not guilty were announced, the military judge ruled he would not grant the requested relief of a maximum punishment of "no punishment" based on prosecutorial misconduct.

### b. Sentencing

At the original trial, EW testified under oath at sentencing. Her testimony was extremely short and included that after the assault she was embarrassed, depressed, and thought about killing herself. Additionally, she stated that, "I mean no disrespect by saying this to anyone that has served our country, but from this event, I can't walk into a Wawa -- or even Dunkin' Donuts this morning. The second I see an Air Force uniform, I vomit." She went on to state that her hopes for the future were to move on. She was back in school for social work, pursuing another degree. Together with her best friend, she planned to "do things in Washington to make rape cases easier, more comforting and soothing for the victim." On cross-examination she indicated she was a forgiving person, and the most important thing for her was that Appellant receives mental health therapy, stating "I do feel that what he did was wrong. . . . I feel that he knew what he was doing was wrong, but the one thing that I don't know is what made his brain think that that was okay." She further indicated "I can't give up on a human being. I can't give up on a soul. . . . I do think that mental health can help, but he's got to be willing to do it." Finally, she expressed concern for Appellant's son, not wanting him to grow up with a father who is a sex offender. When asked specifically if she needed Appellant to be confined to make herself feel better, she indicated "I don't need that, because I'm already a survivor, but I respect their decision, if they feel that that is the punishment that he needs."

At the rehearing, EW provided an unsworn statement to the members that stated:

> I will never forget the night that I made the mistake of opening my parents' front door. The consequences of that decision will be with me for the rest of my life. . . . I will never forget the

11

way he looked at me when he placed his hands around my neck. His face was red. I remember the color creeping up the back of his neck all the way to his face. His arms were also red and the whites of his eyes. You could see the red veins. I told him "[Appellant], you're scaring me." When I said these words to him, I could tell my words were not registering in his brain. In that moment, I thought this was it. I thought I was going to die and that my parents were going to have to pick out my coffin. All I could visualize was being unrecognizable on the kitchen floor because he told me that his fist was going to destroy my face and that my parents wouldn't be able to identify my body.

This experience has changed me in several ways, because I feel stupid that I opened the door that night. . . . I now panic and hesitate anytime someone knocks on the door. I hate the idea of even opening a door because it brings back all of the memories of that night. When I moved, I went from having one lock to having four. Despite all of this, I still don't feel safe.

This experience has also impacted the way that I view the military. Whenever I see the uniform, I get an instant feeling of nausea.

. . . .

This court-martial process has been an emotionally difficult experience to endure yet again. Every time I spoke with a different person about what happened, I have had to relive the trauma of that night. [Appellant] needs to be held accountable for his actions. All I've ever wanted was for [Appellant] to get the help that he needs, and I prayed that he was learning from his previous mistakes. However, I now know, based on his behavior toward me during this court-martial, that he has not accepted responsibility for his actions. [Appellant] only cares about [Appellant]. [Appellant] also needs to learn the respect afforded to the uniform that he has the privilege of wearing. He needs to acknowledge that his actions not only represent him, but that of the United States Air Force.

I am grateful for the opportunity to address the court and have my voice be heard. I have tried to learn something from every experience in my life, whether positive or negative. I'd like to share with you what I've learned from this experience. Sometimes someone has to hurt you deep enough to make you realize how better your life is without them. I ask whatever sentence

> you give to [Appellant] be with the utmost respect to the ordeal that I have been through and the ongoing effect that this has had on my life. Thank you.

**2. Law**

Allegations of prosecutorial misconduct are reviewed de novo. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citing *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017)).

Prosecutorial misconduct occurs when a prosecutor acts in violation of a legal norm or standard, to include professional rules and standards. *United States v. Argo*, 46 M.J. 454, 457 (C.A.A.F. 1997). The court looks to "the overall effect of counsel's conduct on the trial, and not counsel's personal blameworthiness." *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003) (citation omitted).

**3. Analysis**

The record before us presents us with a variety of possible conclusions as to who knew what and when regarding the withdrawal of the second specification of rape involving EW. We agree with the military judge's determination that there was no prosecutorial misconduct which affected the integrity of the rehearing. Although unknown to the military judge at the time of his ruling on this motion, the Defense's reference to Capt Z's 30 March 2015 email disclosing the inconsistencies of EW's description of the second incident during the merits portion of the rehearing is further evidence that there was no exculpatory evidence withheld by the Government.

Having reviewed the testimony of EW at the original trial and the rehearing, we are not persuaded by Appellant's allegation that "new" evidence adduced at the rehearing destroyed EW's credibility and disproves her account of the events surrounding the offenses. EW was cross-examined on a number of inconsistencies at both the original trial and the rehearing. At the original trial, EW was challenged regarding the fact that she did not report any of the allegations, the absence of evidence of damage to her front door, and the absence of any physical manifestations of the choking—no red marks or bruising on her neck, no petechiae in her eyes, and no hoarseness. At the rehearing, EW was similarly challenged on these same inconsistencies, as well as the fact that she reported the sexual encounter after the charged rape as a second sexual assault. Because the assault and battery and communications of a threat charges were not an issue at the rehearing, there was understandably less detail in her testimony regarding those incidents.

Appellant's assertion that "but for" Capt Z's involvement, EW would not have participated is not supported by the evidence. Both Capt Z and EW testified that EW had already determined she would participate in the rehearing.

EW acknowledged that after talking to Capt Z she was ready to say yes, but she had been thinking about whether to participate on her own. EW was a reluctant witness from the very beginning, and her hesitation to go through another trial was not unexpected.

The legal office should not have reached out to Capt Z. Capt Z should have declined to get involved when the legal office reached out to her based on her prior disqualification. Capt Z was not a prosecutor in the rehearing, but her involvement was at the behest of the Prosecution. No one on the rehearing prosecution team had a relationship with EW and so they reached out to someone who did. These events are troubling, but not determinative of the issue before us.

Capt Z's efforts were not the reason that EW participated in the rehearing. EW's statement at the rehearing was an unsworn statement, authorized under the law. The members observed her throughout the rehearing, and were very aware that they had found Appellant not guilty of raping her. The offenses for which Appellant was convicted and sentenced were not directly associated with the charged sexual offenses, were separated in time from the sex offenses for which he was found not guilty, and were not litigated at the rehearing.

Appellant put on a robust sentencing case at the rehearing, to include allegations of being a victim of sexual assault while confined. During his unsworn, Appellant further informed the members of his prior convictions for the same offenses for which they acquitted him as well as the fact that he was not convicted of aggravated assault for the choking event, only the lesser included offense of assault consummated by a battery. Appellant's father testified on sentencing and informed the members that Appellant had testified at the original trial. Appellant's counsel argued that after hearing the same facts that they heard, the previous members found Appellant "touched EW and said something she thought to be a threat." Counsel vehemently challenged the credibility of EW and asked the members to send a message to "this frickin legal office," the SAPR community, and investigators.

The Government requested the members only impose a bad-conduct discharge and the Defense asked for no punishment. The sentence imposed by the members—confinement for 12 months, reduction to the grade of E-4, a reprimand, and a bad-conduct discharge—was a lawful punishment. The sentence imposed was a determination by the members that Appellant's crimes warranted punishment and while EW's participation obviously was a factor in that sentence, the offenses for which Appellant was sentenced were not litigated at the rehearing. It is quite conceivable that Appellant's lack of remorse and repeated minimization of the nature of the underlying conduct associated with the assault and communication of a threat convictions did not resonate well with the members.

We find the involvement of Capt Z at the rehearing was improper but did not result in prejudice to Appellant.

## C. Article 13, UCMJ, Credit

Appellant asserts that he is entitled to an additional 12 days of confinement credit. We disagree.

Appellant filed a motion for appropriate relief on pretrial punishment pursuant to Article 13, UCMJ, 10 U.S.C. § 813, at his rehearing. The military judge found as fact that Appellant entered pretrial confinement at a civilian confinement facility on 28 August 2017 and was housed there in a secured unit until he was released on 8 Sept 2017. Appellant did not receive a shower on his first day, was not provided the opportunity to purchase shower shoes, and when ultimately allowed to take a shower, he noticed semen and human feces on the floor of the shower area. Additionally, Appellant was housed in the same conditions as those serving the death penalty, and restricted to his cell for 23 hours a day. The military judge also found that prior to Appellant arriving at the civilian confinement facility, the base leadership was aware of the dangerous conditions at that facility generally, but chose to maintain its relationship housing Airmen there.

The military judge held the conditions at the confinement facility constituted oppressive conditions; the facility constituted confinement in a manner that was more severe than necessary to ensure Appellant's availability for trial; and the confinement conditions were more rigorous than the circumstances required. The military judge concluded his ruling stating

> So I do find that pretrial confinement credit is appropriate . . . and the court will award three for one confinement credit for the 12 days that he was there. So essentially amounting to an additional 24 days of pretrial confinement credit on top of the 12 days he would be entitled to ordinarily for the time he spent there.

Defense counsel did not have any questions as to the court's ruling.

The military judge clearly articulated the nature of the confinement credit he was awarding. In addition to the 12 days Appellant was entitled to pursuant to *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984), the military judge awarded him an additional 24 days—so ultimately three days of credit for every day spent in the civilian confinement facility. Appellant's interpretation of the "three for one" language used by the military judge to equate to 36 days of credit pursuant to Article 13 is not supported by the facts. Appellant does not assert that the 24 days of credit is inappropriate; he specifically asserts that "this is a mathematical error." We agree that 24 days of additional credit is appropriate and there is no mathematical error.

### III. Conclusion

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court