# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39706**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Clayton W. TURNER**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 25 November 2020

————————————

*Military Judge:* Matthew D. Talcott (arraignment and motions); Rebecca E. Schmidt.

*Approved sentence:* Bad-conduct discharge, confinement for 8 months, and reduction to E-1. Sentence adjudged 7 March 2019 by GCM convened at Dyess Air Force Base, Texas.

*For Appellant:* Major Benjamin H. DeYoung, USAF; Major David A. Schiavone, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Judge KEY delivered the opinion of the court, in which Senior Judge MINK and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

KEY, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of five specifications of assault consummated by a battery in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[1,2] He was sentenced to a bad-conduct discharge, confinement for eight months, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

On appeal, Appellant raises two issues through counsel: whether his conviction (on all specifications) is legally and factually insufficient; and whether he was subjected to illegal post-trial confinement conditions. Appellant personally raises three additional issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). He first alleges the military judge erred in admitting certain expert witness testimony, which Appellant contends exceeded the witness's expertise, and that trial counsel improperly argued as substantive evidence information which had been admitted to show the basis for expert witness testimony. Appellant's second personally raised assertion is that his trial defense counsel were ineffective in not offering evidence of pertinent character traits and in providing incomplete advice on Appellant's choices with respect to whether to be tried by members or by military judge. His third assertion is that trial counsel's findings argument improperly appealed to the military judge's "common sense" and "knowledge of the ways of the world." We have carefully considered Appellant's second and third personally raised claims and have determined they are without basis, and warrant neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

We find the evidence is factually insufficient to affirm the conviction for one of the specifications of assault consummated by a battery as discussed in greater detail below.[3] We thus set aside the finding of guilt for that specification, dismiss the specification with prejudice, and reassess the sentence. Finding no other error, we affirm the remaining convictions and the sentence as reassessed.

## I. BACKGROUND

Stationed at Dyess Air Force Base (AFB), Texas, Senior Airman (SrA) BT was scheduled to take her promotion test at 0730 hours on Wednesday, 9 May

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Appellant was acquitted of a sixth specification of assault consummated by a battery.

[3] Specification 5 of the Charge.

2018. She left her on-base house that morning with her 15-month-old son, MT, and went to their babysitter's house. The babysitter noted SrA BT seemed more rushed than usual, as SrA BT seemed "very standoffish" and did not come in the house and sit and talk, as she ordinarily did. SrA BT left the babysitter's house and drove to the building where her test was going to be held and told the proctor she would not be taking her test that morning because she was going to the hospital. From the test site, SrA BT drove off base to the emergency room at Abilene General Medical Center where she reported to medical providers there that she had been physically assaulted by her husband, Appellant.

Medical records from the hospital indicate SrA BT checked in around 0730 hours and told emergency room staff Appellant had hit her with his fist and "a wooden bat or drumstick," and that he had "choked" her. During the visit, which lasted about an hour, SrA BT complained of neck pain, and the treating physician noted she had "a little soft tissue swelling in her left temple area from sustaining an injury there," leading him to diagnose her with a contusion to her head and cervical neck strain. The physician ordered a CT scan which returned negative findings.

Detective DG from the Dyess AFB Security Forces Squadron learned of the alleged assault and went to the hospital to speak to SrA BT about what had happened. He arrived shortly after 0900, and SrA BT told him she was experiencing "a lot of pain." Detective DG saw "visible injuries" on SrA BT's arms and neck and took pictures of those injuries. He later testified SrA BT appeared "upset," "sad," and "depressed" as she explained to him what had happened.

Shortly thereafter, Appellant was apprehended and brought to Detective DG's office where an investigative photographer took pictures of various injuries on Appellant's body, including marks on his head, back, and arm, and cuts on his face and foot. The same photographer took another set of pictures of SrA BT's injuries later in the day, around 1400 hours, showing dark bruising to her neck, left arm and thigh, as well as a red mark on her lower back. After those pictures were taken, Detective DG and the photographer accompanied SrA BT to her house in order to take photographs of the living room, to include a hole in the wall roughly the size of a human torso. Detective DG met with SrA BT the next day for a follow-up interview.

At Appellant's court-martial, SrA BT testified she met Appellant in February 2016 while they were both stationed in Korea. They began dating, and at the end of May 2016—the day Appellant was leaving Korea for his new assignment at Dyess AFB—SrA BT discovered she was pregnant, something she and Appellant had not planned on. SrA BT was able to cancel her upcoming assignment to England, and she and Appellant married less than three months later in August 2016. SrA BT joined Appellant at Dyess AFB in September 2016.

Their son, MT, was born in January 2017, and the family moved into a house on base the following summer. SrA BT described a turbulent marriage during which the couple frequently had heated arguments about a variety of issues and even physically fought on at least two occasions.

SrA BT testified that on 8 May 2018, the night before her promotion test, she went to sleep upstairs in the bedroom of their two-story house around 2200 hours—early for her—to rest up for the test. Appellant, meanwhile, was still at work, his shift lasting until 2300 hours.

SrA BT woke up around 0100 hours to the sound of the television downstairs "being too loud." She got up, saw Appellant watching television, and asked him to turn the volume down, which he did. SrA BT woke up again around 0400 hours, as the television was "loud again." She texted Appellant, telling him the television woke her up and asking when he was coming to bed. He responded by telling her "to get off his a[*]s." Frustrated, tired, and unable to go back to sleep, SrA BT got up, got dressed, went downstairs, and began folding clothes next to Appellant while he finished watching a movie. SrA BT testified she was upset and complained to Appellant she couldn't sleep, describing her demeanor at the time as being "rude" and "snarky." When the movie ended, SrA BT told Appellant he might as well leave the television on, leading Appellant to tell her, "I'm not doing this sh[*]t tonight" before picking up his drink and going upstairs to the bedroom.

SrA BT said she went to the bedroom to talk to Appellant about why she was upset. Appellant was laying on the bed, and SrA BT sat down next to him and put her hands on his shoulders. She testified Appellant was mad and he shoved her away from him, telling her he was tired of her "bitching at him." Appellant then stood up and started yelling at SrA BT, at which point he grabbed her neck with his right hand and shoved her into the wall with his other hand. SrA BT remembered "hitting the wall with [her] head and [her] neck and seeing him face-to-face with [her] and his hands on [her]." SrA BT said she yelled at Appellant to get away from her, and he let her go, but as she tried to walk past him, he accused her of looking for things to throw at him and he shoved her into the wall and then into her vanity. According to her testimony, SrA BT did not fight back and instead told Appellant to leave her alone and to not touch her.

SrA BT gathered a few items from the bedroom and went downstairs while Appellant stayed upstairs. Realizing that MT was awake and crying, SrA BT went back upstairs to get him and brought him downstairs to the couch where she changed his diaper. She then went to the kitchen—leaving MT on the couch—to throw out the diaper and get MT a drink. SrA BT said she was "yelling" in the kitchen because she was "so upset," and she said out loud she hated Appellant before going back to the couch and putting MT in her lap. As she did

so, Appellant came down the stairs telling SrA BT she was "not going to cuss out [their] child" and that SrA BT "wasn't fit to hold [MT] right now."

Appellant and SrA BT continued arguing, and SrA BT testified Appellant took hold of the coffee table in front of the couch and "threw it behind him" so that it was pushed up against a bookshelf, and he demanded SrA BT release MT. When she refused, Appellant grabbed SrA BT—who was still holding MT—by her ankles and pulled her off the couch such that her back and head hit the ground. SrA BT said Appellant tried prying her arms off MT, but she rolled on her side, telling Appellant to stop and leave MT alone. Appellant then grabbed MT's arm, leading SrA BT to release MT. She said, "As soon as he had hands on my son, I let go. I wasn't going to pull." SrA BT agreed with trial defense counsel's characterization that Appellant picked MT up by MT's arm and then "kind of scooped him with the other hand to hold him." Once Appellant took MT from SrA BT, he put MT on the couch.

SrA BT said she stood up, and then Appellant shoved her into a wall with both hands "as hard as he could," leaving a large hole in the drywall. SrA BT was pleading with Appellant to stop and to let her get to MT, but Appellant responded by threatening to punch her and knock her unconscious. MT, meanwhile, climbed off the couch and began walking toward SrA BT, but Appellant would "shove him back and [MT] would fall down," which kept MT from reaching SrA BT. Appellant then began punching SrA BT in her temple and on the back of her head. SrA BT testified that she heard MT cry "as if he was in pain," and Appellant said, "I didn't mean to do it. He got in the way." SrA BT said she "panicked because [she] thought [her] son was hurt," and she started punching back at Appellant. While this was going on, MT crawled towards an adjacent room, and SrA BT picked up and threw a plastic child's chair at Appellant in the hopes of distracting Appellant so that she could get to MT, but Appellant "blocked it."

SrA BT testified that after throwing the chair, she "was trying to figure out something else to do," and she picked up a drumstick and held it in front of her, telling Appellant to stay away from her and "leave us alone," threatening to hit him with it if he did not comply. Appellant, however, "came forward a couple of times," and SrA BT said she hit him on the arms several times with the drumstick "to get him away from [her]," but she did not recall hitting him on his head. Appellant then "lunged forward" and grabbed SrA BT's arms such that she was "back on the floor." Appellant took the drumstick from her and began hitting her in the head with it, "[s]everal times all over [her] temple" as well as "a blow" on the back of her head, calling her a "red-faced Indian" and saying, "You like getting hit in the head with sticks?" SrA BT began "screaming for help," and then Appellant grabbed her neck again, with two hands at first and then just with his left hand, using his other arm to hold her down. SrA BT

testified she could not breathe "for a few moments," but Appellant eventually let go of her neck while still holding her down. SrA BT said she was "screaming at the top of [her] lungs for help," while Appellant told her he would let her go if she would "calm down." SrA BT was able to reach over to a nearby dog kennel and release the dog inside. The dog began barking and circling the two, leading to Appellant letting go of SrA BT such that she was able to get to MT and sit down on the couch with him.

Appellant walked over to the closet, retrieved two guns and some ammunition, and then went upstairs and locked himself in the bedroom. SrA BT began making a plan to go to the emergency room, get her son to his babysitter, and to notify the appropriate personnel she would not be able to take her promotion test. Realizing she needed an additional pair of pants, she unlocked the bedroom door and found Appellant "passed out asleep, his guns on the floor and a loaded magazine on the night stand." She got her pants and walked out of the bedroom, closing the door behind her, and left with MT for the babysitter's house on her way to the test site and then the emergency room.

Later in the day, SrA BT picked MT up from his babysitter who testified she saw bruises on SrA BT's arms and on her throat. SrA BT also met with her first sergeant, Master Sergeant (MSgt) BN, early that afternoon. He reported seeing "visible red marks" on SrA BT and what "looked like finger imprints on her arms and around her neck." MSgt BN saw SrA BT three days later and noticed that the bruising had become more pronounced. "I've never seen bruising like that before on anybody; black, blue, red, white," he said. "It looked like a half-sleeve bruise on her left arm," and what appeared to be finger marks on SrA BT's left arm and neck "were more distinctive."

By the time of Appellant's court-martial, almost a year later, SrA BT and Appellant were going through divorce proceedings in which the two had been granted joint custody—an "even split"—of MT, although SrA BT conceded she would prefer to have greater custodial rights, and she had sought a protective order against Appellant early in the proceedings. SrA BT had also applied for a "humanitarian" transfer so that she could be closer to her family, a request which was still pending at the time of trial.

On cross-examination, SrA BT acknowledged that when she was first interviewed about the assault the day after it occurred, she told Detective DG that Appellant had only used one hand at a time to choke her, and he never used both hands. SrA BT also admitted she testified in a deposition related to the divorce proceedings that the chair she threw hit Appellant in the back.

Both parties called expert witnesses to offer their opinions about the source and age of the various injuries suffered by SrA BT and Appellant. The Government called Dr. DS, an expert in forensic nursing and wound examination with

extensive experience in assessing and intervening in instances of domestic violence. The Defense called Dr. RF, an expert in forensic pathology and biomechanics with significant expertise focused on investigating causes of death. The two doctors generally agreed the photographs of SrA BT and Appellant depicted injuries, but disagreed in certain particulars as to whether the injuries were consistent with SrA BT's testimony. With respect to SrA BT, the primary injuries the experts focused on were those to her neck, back, upper left arm, lower right arm, and right thigh.

Photographs of SrA BT's neck depict bruises radiating laterally from her windpipe towards the back of her neck on her right side. No significant bruising was noted on the left side of her neck. Dr. DS concluded the injuries were caused by a combination of bruising and abrasions, consistent with SrA BT being strangled by being grabbed by the neck. He further concluded the abrasions could be caused by a person struggling while being strangled. Dr. RF did not disagree that the bruising appeared to have been caused by someone grabbing SrA BT's neck, but he hypothesized SrA BT would have been grabbed from behind based upon SrA BT's report of pain on the back of her neck, a small crescent-shaped mark he attributed to a fingernail, and the lack of a corresponding thumb-caused bruise on the opposite side of SrA BT's neck. Dr. DS, however, disputed the premise that the crescent-shaped mark came from a fingernail, concluding it was "just part of the overall presentation of trauma that is a combination of two mechanisms, squeezing mechanism for the bruising with rubbing mechanisms that caused abrasions." He noted the mark was not consistent with other fingernail wounds he had seen, and he also testified that he had seen strangulation cases in which no opposing-side injury was visible to the naked eye.

Photographs of SrA BT's lower back show a roughly rectangular wound extending vertically. Dr. DS testified this type of injury is referred to as a "patterned injury" because it can be matched to a particular object which caused the injury. Dr. DS could not identify the precise object which caused this injury to SrA BT's back, but he said it could have been caused by her being pushed up against the wall or her vanity. Dr. RF said that Dr. DS's explanation was "very reasonable," and that this injury could have been caused by SrA BT being hit by, being pushed into, or falling on something. He added that he did not think the wound was caused when SrA BT was pushed into the downstairs drywall, because the pictures showed the damaged drywall had jagged edges, which was inconsistent with the relatively straight lines of the mark on SrA BT's back.

The inside of SrA BT's upper left arm near her armpit had a large bruise with small darker spots on the outer edges. Dr. DS testified this was consistent with a thumb pressing into SrA BT's arm while being grabbed, and Dr. RF

agreed. Dr. RF also noted a corresponding mark on the outside of SrA BT's arm and hypothesized the injuries could have been caused by someone grabbing her arm to restrain her.

SrA BT's lower right arm showed evidence of bruising which Dr. DS described as consistent with "a compression bruise or squeeze." Her arm also had abrasions which he said could be caused by being pushed up against a wall or pulled off a couch. SrA BT's right thigh exhibited signs of bruising combined with some abrasion, which Dr. DS said was likely caused by a mix of blunt force and rubbing, which would be consistent with running into something or hitting something.

With respect to Appellant, the experts focused on a scratch near Appellant's nose, a thin two-and-a-half-inch-long red mark on the left side of his head, parallel two-inch-long linear red marks on his right forearm, and two irregular red marks on his back. Dr. DS described the scratch on Appellant's face as "very superficial" and the mark on his head as a scratch which was at least 24 hours old when the picture was taken. Dr. DS said the marks on Appellant's forearm were consistent with being struck by a cylindrical solid object, such as a drumstick. Dr. DS's opinion was that the marks on Appellant's back predated the fight. Dr. RF agreed the marks on Appellant's forearm could have been caused by a drumstick, and he hypothesized it would have likely been a "defensive" injury in which Appellant was hit while "defending his head or some other part of his body." Contrary to Dr. DS's assessment, Dr. RF thought the mark on Appellant's head looked like a "fresh injury" that could have been caused by "a thin linear object" like a drumstick. Dr. RF testified that the marks on Appellant's back were "certainly well within [the] time range" of the fight and said they "fit the criteria for a good scratch mark," possibly from fingernails. Dr. RF thought the scratch on Appellant's face was more serious than Dr. DS did, characterizing it as a "quite deep abrasion" which was likely caused by "something thin and relatively sharp . . . like a fingernail."

Appellant was charged with four specifications of assault consummated by a battery against SrA BT. The first specification alleged he unlawfully grabbed SrA BT on her neck with his hand on divers occasions. Trial counsel argued Appellant committed this offense when he grabbed her neck and pushed her into the wall upstairs and when he strangled her downstairs. The second specification alleged Appellant pushed SrA BT on her body with his hands on divers occasions, and trial counsel pointed to Appellant pushing SrA BT into the vanity and into the wall downstairs. Under the third specification, Appellant was charged with pulling SrA BT's ankle with his hand, which trial counsel said occurred when Appellant pulled SrA BT off the couch. The fourth specification alleged Appellant struck SrA BT on her head with his hand and with a drumstick on divers occasions. Trial counsel argued Appellant was guilty of this

specification based upon Appellant hitting SrA BT in her temple when she was trying to get to MT and then hitting her on her head with the drumstick Appellant took away from her.

Appellant was also charged with two specifications of assault consummated by a battery against MT. The first specification alleged Appellant "unlawfully pull[ed]" on MT's arm; the second specification—of which Appellant was acquitted—alleged Appellant "unlawfully push[ed]" on MT's body. There was no evidence of any physical injury to MT.

The Defense's theory was that SrA BT had instigated the fight, Appellant was defending both himself and MT, and SrA BT had exaggerated Appellant's role in the fight based upon a motive to gain leverage in their divorce and child-custody proceedings. Trial defense counsel sought to impugn SrA BT's testimony by arguing her injuries were inconsistent with her testimony that Appellant brutally attacked her and were, instead, more consistent with Appellant restraining her in self-defense.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant argues his conviction on the charge and its specifications is both legally and factually insufficient. In so arguing, he alleges: SrA BT had a motive to fabricate her testimony; her testimony was not credible by virtue of inconsistences in it; and the investigation was insufficient. He further argues that the disagreement between the expert witnesses should undermine our confidence in his conviction with respect to the assaults on SrA BT. We disagree.

With respect to the specification alleging Appellant assaulted MT by pulling on his arm, Appellant argues no assault occurred, because there was neither an offensive touching nor any evidence of unlawful force or violence. We agree with Appellant that the conviction for this specification is factually insufficient.

#### 1. Law

We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United*

*States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 2. Analysis

In order to find Appellant guilty of assault consummated by a battery, the Government was required to prove beyond a reasonable doubt: (1) that Appellant did bodily harm to a particular person, and (2) that the bodily harm was done with unlawful force or violence in the manner alleged. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 54.b.(2). For the specification pertaining to MT, the Government had to additionally prove MT was under the age of 16 years old. *See MCM*, pt. IV, ¶ 54.b.(3)(c). "Bodily harm" is defined as "any offensive touching of another, however slight," and the act "must be done without legal justification or excuse and without the lawful consent of the person affected." *MCM*, pt. IV, ¶ 54.c.(1)(a). "Unlawful force or violence" is demonstrated if an accused "wrongfully caused the contact, in that no legally cognizable reason existed that would excuse or justify the contact." *United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011) (citation omitted).

Self-defense is an affirmative defense to a charge of assault consummated by a battery and has three elements. First, the accused must have apprehended, on reasonable grounds, that bodily harm was about to be inflicted on

him; second, the accused must have believed that the force he used was necessary for protection against bodily harm; and, third, the force used by the accused must have been "less than force reasonably likely to produce death or grievous bodily harm." *See* Rule for Courts-Martial (R.C.M.) 916(e)(3). The right to self-defense is lost "if the accused was an aggressor, engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred." R.C.M. 916(e)(4). However, an accused who starts an affray is entitled to use reasonable force in self-defense to defend against an opponent who escalates the level of the conflict. *United States v. Dearing*, 63 M.J. 478, 484 n.24 (C.A.A.F. 2006) (citations omitted). Similarly, defense of another is an affirmative defense so long as an accused uses no more force than the person being defended could lawfully use. R.C.M. 916(e)(5). Once raised, the Government has the burden of proving beyond a reasonable doubt that the defense of self-defense or defense of another did not exist. R.C.M. 916(b)(1).

### a. Assault of SrA BT

We conclude a reasonable factfinder could find all the elements of assault consummated by a battery against SrA BT beyond a reasonable doubt. SrA BT went to an emergency room reporting that she had been assaulted by Appellant just a few hours earlier. Medical and law enforcement professionals along with lay witnesses observed visible injuries on her body, which another witness reported grew more pronounced as the week progressed. SrA BT testified that Appellant grabbed her neck twice, pushed her into both her vanity and upstairs and downstairs walls, pulled her ankles, and struck her in the head multiple times. The Defense did not meaningfully impeach SrA BT's credibility, and—based upon her testimony alone—a reasonable factfinder could conclude each of these acts amounted to an offensive touching committed without her consent. Similarly, if a factfinder gives absolute credit to SrA BT's testimony, Appellant would have no viable self-defense claim, as he was the initial aggressor when SrA BT tried to talk to him in the bedroom and then again when he pulled her off the couch in an effort to get MT away from her. SrA BT said she did punch Appellant, but this was immediately after Appellant was punching her in the head, thus, a rational factfinder could conclude SrA BT was fighting back—that is, exercising her own self-defense rights—rather than initiating an attack or escalating the level of the conflict. SrA BT testified she struck Appellant with the drumstick several times, but this was after she held it out in front of her, telling Appellant to leave her and MT alone. When Appellant advanced toward her, she hit him with the drumstick, but he promptly disarmed her and proceeded to attack her with the drumstick and then strangle her. A rational factfinder could conclude SrA BT did not escalate the level of

the conflict by picking up the drumstick, and instead was trying to defend herself or de-escalate the conflict. Moreover, a factfinder could readily determine there was no evidence that, once Appellant took the drumstick away from SrA BT, he either reasonably apprehended bodily harm was about to be inflicted on him, or that he actually believed strangling SrA BT was necessary to protect himself.

SrA BT's divorce and child-custody proceedings may have given rise to a motive for SrA BT to exaggerate Appellant's culpability and minimize her own, but there was no evidence such motivations existed at the time SrA BT initially reported the assault, just a few hours after the assault occurred. According to the record before us, the divorce and child-custody proceedings were not initiated until some later point in time, and a rational factfinder could find implausible the notion that SrA BT devised a plan to achieve a favorable bargaining position in uninitiated litigation in the early morning hours immediately after sustaining significant injuries at Appellant's hands. SrA BT's version of events of the assault remained largely consistent between her initial report and her testimony at trial, and the Defense was only able to point to minor inconsistencies, such as whether Appellant blocked the child's chair with his arms or that it hit his back and whether he briefly had two hands on her neck at one point or he used only one hand to choke her. SrA BT's visible injuries also corroborated her testimony, and the Defense's expert did not dispute SrA BT had been injured or raise any doubt that Appellant had caused those injuries. Notably, Dr. RF did not disagree with the proposition that the marks on SrA BT's neck appeared to have been caused by someone grabbing her neck—his point of contention was simply whether SrA BT was grabbed from the front or the back. A rational factfinder would be free to conclude Dr. DS offered the more credible assessment as to Appellant's position when he strangled SrA BT, an assessment which both matched SrA BT's testimony and the pictures of finger-shaped bruises on SrA BT's neck.

Appellant also argues the investigation into the assault was inadequate in that investigators did not take any pictures of the upper floor of the house, did not collect the text messages SrA BT said she sent Appellant just prior to the assault, and did not adequately interview the neighbors. Appellant exposed these concerns during the trial. While each of these investigative aspects could have contributed to the overall evidence in the case, a rational factfinder could also conclude their absence does not create reasonable doubt or otherwise undermine SrA BT's testimony, the photographic documentation of her injuries, and the other evidence in the case. Therefore, we find Appellant's conviction for the four specifications alleging assault consummated by a battery against SrA BT to be legally sufficient. After carefully considering the evidence presented at trial, we ourselves are convinced of Appellant's guilt of the first four

specifications of the Charge beyond a reasonable doubt. As a result, we conclude his conviction of these four specifications is also factually sufficient.

### b. Assault of MT

We are not so convinced with respect to the fifth specification alleging the assault against MT wherein Appellant grabbed MT's arm with one hand and used his other hand to "kind of scoop" MT up in order to hold him before setting him down on the couch. Depending on how one views the evidence, Appellant was either taking MT away from SrA BT because he believed SrA BT was not in the right frame of mind to be holding the child, or he was taking MT away so that he could continue his attack on SrA BT without MT being caught in the middle. Under either scenario, it is difficult to understand the Government's theory that Appellant did bodily harm to MT with unlawful force or violence by pulling on MT's arm. According to SrA BT's testimony, she let go of MT as soon as Appellant "had hands on" MT, because she did not want to pull on MT. Thus, the evidence in the case is that Appellant tried to pry SrA BT's arms off his son, and then picked him up out of SrA BT's arms when she released him and placed him on the couch.

Given MT's age, we presume he was incapable of manifesting his consent or opposition to his father touching him in this case, so the military judge was required to determine if the touching was offensive to MT based on the surrounding circumstances. Moreover, the military judge had to conclude there was no legally cognizable reason justifying Appellant's contact with MT in order to find him guilty. Even if a factfinder were to find Appellant's picking up of MT amounted to an offensive touching from MT's perspective, we are still left with the question of a parent's legal rights with respect to handling their small children, an issue that has not been addressed in depth by military courts. In discussing the somewhat analogous issue of the affirmative defense of parental discipline, the United States Court of Appeals for the Armed Forces (CAAF) has highlighted the "inherent tension between the privacy and sanctity of the family, including the freedom to raise children as parents see fit, and the interest of the state in the safety and well-being of children" and recognized that discipline often has "a physical component." *United States v. Rivera*, 54 M.J. 489, 491 (C.A.A.F. 2001). The CAAF explained it had previously held parents may use force to safeguard or promote the welfare of minors so long as the degree of force used is reasonable. *Id*. (citation omitted). Considering the fact that a parent may use some degree of physical force to protect or to discipline a child, some touching by a parent of a child must be legally permissible outside of a disciplinary context and regardless of the child's consent, even though the same conduct could amount to unlawful bodily harm when carried out against another. *See, e.g., Pleasants v. Town of Louisa*, 524 Fed. Appx. 891, 897 (4th Cir. 7 May 2013) (unpub. op.).

Based on the evidence presented, SrA BT did not want Appellant to take MT from her, but we are unconvinced SrA BT had any greater authority to hold MT than Appellant did. No evidence was adduced that Appellant violently or abusively handled MT or that he picked him up with any sort of intent to harm MT. The Government's evidence was that Appellant grabbed MT's arm, and then took MT out of SrA BT's hands after SrA BT let go of him. In the face of Appellant's right—as MT's father—to non-abusively pick up MT, the Government has failed to prove Appellant did bodily harm to MT with unlawful force or violence. Even if we assume a rational factfinder could conclude the elements of assault consummated by a battery were met in this case, we are not convinced beyond a reasonable doubt Appellant is guilty, and we therefore find his conviction of this specification factually insufficient.

## B. Confinement Conditions

Appellant argues his post-trial confinement conditions violated his rights under the Eighth Amendment to the United States Constitution[4] and Article 55, UCMJ, 10 U.S.C. § 855. Appellant also argues that, even in the absence of an Eighth Amendment or Article 55, UCMJ, violation, his confinement conditions rendered his sentence inappropriately severe, warranting relief under Article 66(c), UCMJ.

### 1. Additional Background

Once sentenced to confinement at his court-martial, Appellant was incarcerated in Texas at the Taylor County Jail from 7 March 2019 until he was released on 19 September 2019. Appellant submitted matters in clemency prior to the convening authority taking action on 28 May 2019, but Appellant made no reference to any concerns with his confinement conditions in those matters.

On 5 September 2019—two weeks before his release—Appellant made a complaint under Article 138, UCMJ, 10 U.S.C. § 938. In his complaint, Appellant wrote, "After submitting an inmate's request form to officials, pests and vermin were found in immediate living conditions at [the jail]. I asked for the facility to eliminate or minimize the infestation of mice, roaches, ants, beetles, crickets, and spiders." He asserted he had woken up "on numerous occasions" to find "ants crawling on [him] in [his] bed," he had managed to trap three mice, and he saw three other inmates receive antibiotics after being bitten by spiders.[5] He further noted that "[p]est control personnel do spray regularly in the facility but to no avail." On 27 September 2019—eight days after Appellant

---

[4] U.S. CONST. amend. VIII.

[5] We may consider matters outside the entire record to resolve allegations of violations of Article 55, UCMJ, 10 U.S.C. § 855, or the Eighth Amendment. *United States v. Jessie*, 79 M.J. 437, 445 (C.A.A.F. 2020).

had been released—the commander of the 7th Security Forces Squadron, Major (Maj) MM, sent Appellant a written reply to his complaint. Maj MM wrote that he only learned of Appellant's complaint on 18 September 2019—the day before Appellant's release—and that Appellant's complaint was "being taken with the utmost seriousness." Maj MM asserted that once Appellant informed his staff about insects and rodents, "an immediate investigation was launched to personally inspect [Appellant's] cell by [his] staff." Maj MM further wrote that after that inspection, "[M]y staff offered to you to move to a new cell as a possible immediate resolution to the problem at hand. However, you declined this offer." He went on to write to Appellant, "[Your] unwillingness to move to a new cell prevented us from rectifying your complaint before you were released from confinement."

In support of his appeal, Appellant submitted an affidavit in which he reiterated his complaints, adding that he had previously complained to jail staff, and that he never received Maj MM's offer to be moved to a new cell. Appellant did acknowledge Maj MM's staff had investigated Appellant's cell and that Maj MM's staff said they would speak with Taylor County Jail personnel about pest management. Appellant's affidavit expanded upon his Article 138, UCMJ, complaint, explaining that the ants were "sugar ants," and that "[c]rickets, earwigs, brown recluse spiders, beetles, mice, and wasps were also common in the facility and individual cells." He further alleged an inmate in a cell next to Appellant had been bitten by a brown recluse spider, causing his nipple to swell "to the size of a tennis ball from infection."

The Government responded with an affidavit from the Dyess AFB corrections officer, Captain (Capt) KF, and an attached memorandum from Senior Airman (SrA) KM, who was performing the duties of the noncommissioned officer in charge of corrections for the base. Capt KF asserts his staff was required to visit Air Force inmates at the jail on a weekly basis, and that his staff offered Appellant the opportunity to transfer to a new cell after seeing "several ants," but Appellant declined.[6] SrA KM's memorandum explains that on 3 September 2019, Appellant "brought up the issue of insects in his cell, and stated he had filed a complaint with Taylor County Jail." She further states two noncommissioned officers asked Appellant if he wanted to move to a new cell, and Appellant responded he did not want to move, but that he would be filing a complaint under Article 138, UCMJ.[7]

---

[6] The ants were seen near a packet of jelly under the sink in Appellant's cell; SrA KM's memorandum says Appellant claimed insects dragged the packet under the sink.

[7] Although the memorandum names the two noncommissioned officers, it does not explain whether they were members of the Dyess Air Force Base corrections staff, Appellant's unit, or some other organization.

The Government also provided an affidavit from Sergeant KH, the Taylor County Correctional Facility staff investigator. Sergeant KH explained the jail maintained a formal grievance process, which every prisoner was aware of, and Appellant never submitted a formal complaint regarding any matter during his incarceration. In addition to the grievance process, inmates could submit written requests and make informal complaints. Although the jail records reflect Appellant submitted requests for such matters as obtaining dental floss and having books mailed to him, there was no record of Appellant complaining about any matter.[8]

### 2. Law

We review de novo whether an appellant has been subjected to impermissible post-trial confinement conditions in violation of the Eighth Amendment or Article 55, UCMJ. *United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001)). Both the Eighth Amendment and Article 55, UCMJ, prohibit cruel and unusual punishment. In general, we apply "the [United States] Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, except in circumstances where . . . legislative intent to provide greater protections under [Article 55]" is apparent. *United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F. 2000) (citation omitted). "[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)). As the Supreme Court has explained, "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

A violation of the Eighth Amendment is shown by demonstrating:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [an appellant]'s health and safety; and (3) that [an appellant] "has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ . . . ."

---

[8] Sergeant KH's affidavit states Appellant's earliest request (which pertained to releasing property to his family) was dated 3 May 2019, and his last request (regarding receiving books in the mail) was dated 25 August 2019.

*Lovett*, 63 M.J. at 215 (footnotes omitted) (quoting *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997)).

"[A] prisoner must seek administrative relief prior to invoking judicial intervention" with respect to concerns about post-trial confinement conditions. *Wise*, 64 M.J. at 471 (alteration in original) (quoting *White*, 54 M.J. at 472). "This requirement 'promot[es] resolution of grievances at the lowest possible level [and ensures] that an adequate record has been developed [to aid appellate review].'" *Id.* (alterations in original) (quoting *Miller*, 46 M.J. at 250); *see also United States v. McPherson*, 73 M.J. 393, 397 (C.A.A.F. 2014). "Absent some unusual or egregious circumstance," an appellant must both exhaust the grievance system at the confinement facility as well as petition for relief under Article 138, UCMJ. *Wise*, 64 M.J. at 469 (quoting *White*, 54 M.J. at 472).

Under Article 66(c), UCMJ, we have broad authority and the mandate to approve only so much of the sentence as we find appropriate in law and fact and may, therefore, grant sentence relief, without finding a violation of the Eighth Amendment or Article 55, UCMJ. *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016); *see United States v. Tardif*, 57 M.J. 219, 223 (C.A.A.F. 2002). In considering Article 66(c)-based claims, we have declined to require appellants to demonstrate they have previously exhausted administrative remedies prior to seeking judicial relief. *See United States v. Henry*, 76 M.J. 595, 610 (A.F. Ct. Crim. App. 2017). We instead consider the entire record and typically give "significant weight" to an appellant's failure to exhaust those remedies before requesting judicial intervention. *Id.* Unlike claims raised under Article 55, UCMJ, or the Eighth Amendment, we may not consider matters outside the record for a sentence-appropriateness review under Article 66(c), UCMJ, unless those matters amplify information already raised in the record, such as that which is raised to the convening authority as part of a clemency request. *Jessie*, 79 M.J. at 441–42; *see also United States v. Matthews*, No. ACM 39593, 2020 CCA LEXIS 193, at *13–15 (A.F. Ct. Crim. App. 2 Jun. 2020) (unpub. op.).

### 3. Analysis

Appellant submitted an Article 138, UCMJ, complaint regarding his confinement conditions, albeit only two weeks before he was released from the Taylor County Jail. Two days before submitting that complaint, Appellant made his concerns known to Dyess AFB corrections personnel and alleged he had filed a separate complaint with the jail—an assertion he styles as "submitting an inmate's request form" in his Article 138 complaint, a request the jail has no record of. The Government submitted matters in response, but they do not directly dispute Appellant's allegations regarding the presence of bugs and mice in his cell; rather, the government matters focus on the fact that the jail had regular pest-control service, a point which Appellant does not contest. The

primary factual dispute between Appellant and the Government is whether Appellant was offered the opportunity to change cells or not, an issue which pertains more to remedial measures pursued than to the conditions of Appellant's confinement. In spite of this difference, we conclude we need not require additional fact finding pursuant to *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997), because "we can determine that the facts asserted, even if true, would not entitle [A]ppellant to relief." *White*, 54 M.J. at 471.

Even if we assume, for the purposes of our analysis, that Appellant exhausted the jail's grievance system, we conclude Appellant has not met his burden under the Eighth Amendment.[9] Appellant has not demonstrated "an objectively, sufficiently serious act or omission resulting in the denial of necessities." Giving his complaint that there were bugs and mice in his cell the maximum credence possible, we cannot conclude such conditions rise to the level of the denial of necessities. Waking up at night to (apparently non-biting or stinging) ants is undoubtedly unpleasant, but Appellant has not established this occurred so frequently or in such an aggravated fashion as to amount to more than a relatively minor irritant. He has not complained he suffered any injury or illness caused by ants or other bugs, nor has he explained how they interfered with his daily routine in any form or fashion. The same is true of the mice Appellant encountered, three of which Appellant was able to catch. We note that although Appellant complained to his command about the pests, he did not do so until the very end of his time at the jail, after he had been confined there for nearly six months. The fact he waited so long to raise his concerns is a strong indication the bugs and mice were not as great of a concern as Appellant would now have us find. We also note that occasionally encountering bugs and mice in one's dwelling or workplace is a relatively common feature of even non-incarcerated human existence, further diminishing any force behind Appellant's Eighth Amendment claim. Moreover, Appellant has not shown that the prison officials exhibited a deliberate indifference to Appellant's health and safety, as he acknowledges the jail regularly performed pest-control measures. Without more, Appellant has failed to demonstrate the conditions of his confinement were so severe that they amounted to a constitutional violation, and he is therefore entitled to no relief.

We also decline to grant Appellant relief under our Article 66(c), UCMJ, authority because the matters Appellant complains of fall outside the record, as he did not raise them in his clemency submission. Although the CAAF has determined the service Courts of Criminal Appeals may consider matters

---

[9] Appellant has not argued his confinement conditions should be analyzed under any different standard under Article 55, UCMJ. *See United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006).

raised outside the record regarding confinement conditions as part of their Article 66(c), UCMJ, review, that is only the case when the record itself contains information about those conditions. *Jessie*, 79 M.J. at 441–42. In this case, Appellant's record contains no information about his post-trial confinement conditions—his concerns were solely raised through his appeal to this court.

## C. Expert Witness Testimony and Related Exhibits

Appellant asserts the military judge abused her discretion by allowing a government witness to testify about his opinions regarding the cause of SrA BT's injuries. Appellant also claims the military judge erred in permitting trial counsel to reference statistics from various scholarly articles which had been admitted into evidence and cited during witness testimony.

### 1. Additional Background

#### a. Government Expert Qualification

The Government sought to have Dr. DS recognized as an expert in the field of forensic pathology. Trial defense counsel objected to Dr. DS being recognized as a forensic pathologist, as opposed to a forensic nurse. Dr. DS explained that he was "a PhD prepared nurse with a specialty in working with forensic patients and also injuries and wounds," further describing himself as "an advanced practice forensic nurse" with training and experience "in working with injuries and wounds that deal with reported interpersonal violence." After Dr. DS explained this, trial counsel moved the military judge to recognize Dr. DS as an expert "in the field of forensic nursing and in wound examination," to which trial defense counsel did not object.

During Dr. DS's direct examination, trial counsel asked him his opinion about what could cause a particular injury, leading the Defense to object that Dr. DS's expertise in "forensic nursing" and "wound examination" (as opposed to pathology) would not extend to wound causation. Dr. DS detailed his training and experience, which included more than 500 lectures on forensic wound identification and documentation, including "the mechanisms of injury." He further explained he had co-taught classes with physicians regarding the mechanisms of injuries and was involved with studies specifically related to bruising. Dr. DS had also served as an operating room technician in the Air Force and an emergency room nurse before developing two different family violence intervention programs in which he focused solely on incidents of domestic violence. Dr. DS also served as a state-level abuse investigator in which he had to assess the origin of injuries to group-home residents who could not articulate how they were injured due to cognitive challenges. In addition, he performed the duties of a forensic nurse examiner, focusing on cases of sexual assault and domestic violence, ultimately conducting examinations numbering

"into the thousands." The military judge overruled the Defense's objection, concluding Dr. DS qualified as an expert on injury causation based upon his knowledge, experience, training, and education. She specifically noted Dr. DS had both attended and taught various courses as well as investigated injuries. She explained she found Dr. DS's testimony would be helpful in understanding the photographic evidence, medical records, medical testimony, and lay testimony regarding the injuries involved in the case.

### b. Articles Admitted into Evidence

During Dr. RF's testimony, trial defense counsel sought to admit—over Government objection—several academic articles and studies that Dr. RF relied on in formulating his opinions, telling the military judge they were not being offered as substantive proof, but rather "as the basis of his opinion" and "facts and data that he relied upon." Trial defense counsel cited Mil. R. Evid. 703 as authority for admitting these documents, and the military judge agreed the documents were admissible, but she questioned whether the documents could be admitted in documentary form, or if the relevant portions of the documents needed to be read aloud in court based upon the "learned treatise" exception to the rule against hearsay under Mil. R. Evid. 803(18). Trial counsel pointed out that this exception would not permit the admission of the documents as exhibits, but would allow portions of them to be read into evidence. Trial defense counsel argued they were only "trying to admit" the documents under Mil. R. Evid. 703, and not Mil. R. Evid. 803, and that the military judge could limit herself to considering the documents as "non-substantive proof" and admit them as exhibits "with that limiting instruction." At this point, trial counsel and trial defense counsel had an off-the-record conversation after which trial counsel withdrew their objection "to the paper format" of the documents. The military judge then told the parties she would "accept any agreement between the parties as to which portions [they] would like for [her] to consider," and she would "disregard the remainder of the article," if the parties desired. Trial counsel responded, "I don't think there's any need for the Court to impose that sort of limit in this case," and the military judge allowed the Defense to admit the exhibits.

In cross-examining Dr. RF, trial counsel confronted Dr. RF, without objection, with several statistics from the articles admitted as defense exhibits, including that 50 percent of strangulation victims have no visible injuries, and 30 percent have injuries which are too minor to be photographed. In doing so, Dr. RF acknowledged that he relied upon the articles and that he believed the articles were useful and reliable sources. Trial counsel also offered another article as a prosecution exhibit, and trial defense counsel stated, "No objection to it being admitted under the same rule, not as substantive proof, but as something that will be considered by the expert." The military judge responded,

"Right, under [Mil. R. Evid.] 703." Trial counsel then restated that the exhibit was being offered "subject to the same limitation that [trial defense counsel] just described." Trial defense counsel replied, "Under that limitation, no objection, Your Honor." Trial counsel proceeded to offer several additional articles under the same theory of limitation, which trial defense counsel had no objection to. Trial counsel offered more articles in the Government's rebuttal case, and trial defense counsel stated they had no objection to them being admitted as exhibits "pursuant to [Mil. R. Evid.] 703."

During closing argument, trial counsel cited to some conclusions and observations contained in the articles admitted into evidence, such as pointing to the statistic that 50 percent of strangulation victims have no visible injuries. Trial defense counsel objected to trial counsel's argument, asserting that the articles were "not admitted as substantive proof." Trial counsel responded that the information was available for the military judge's use for two reasons: (1) it was "fair commentary on the sources of the expert's testimony," and (2) the statistics "were read into evidence from a learned treatise by an expert on the stand under the hearsay rule." Thus, trial counsel argued, the statistics were "admissible for the truth of the matter asserted under the exception to the hearsay rule, and they were read in without objection." The military judge overruled the defense objection "consistent with [Mil. R. Evid.] 803(18)(A)," pointing to the fact the defense expert testified about these same portions of the exhibits on cross-examination.

### 2. Law

#### a. Government Expert Qualification

We review de novo the question of whether a military judge performed the gatekeeping function required by Mil. R. Evid. 702 properly, and we review a military judge's decision to permit a witness to testify as an expert and any limitations placed on the permitted scope of that witness's testimony for abuse of discretion. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014) (citations omitted). Mil. R. Evid. 702 permits expert testimony when the witness "is qualified as an expert by knowledge, skill, experience, training, or education" so long as the testimony is helpful and based upon adequate facts, reliable principles, and reliable application of the principles to the facts. The United States Court of Military Appeals, predecessor to the CAAF, set out six factors derived from the Military Rules of Evidence for assessing the admissibility of expert testimony: (1) the expert's qualifications; (2) the testimony's subject matter; (3) the testimony's basis; (4) the relevance of the testimony; (5) the testimony's reliability; and (6) whether the probative value is outweighed by other considerations. *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (citations omitted). Shortly after *Houser* was decided, the Supreme Court decided *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993). In *Daubert*, the

Supreme Court set out six non-exclusive factors to be considered in whether scientific evidence is reliable and relevant. 509 U.S. at 593–95. The CAAF concluded that *Daubert* is consistent with *Houser*, and the *Daubert* decision provides "more detailed guidance on the fourth and fifth *Houser* prongs pertaining to relevance and reliability." *United States v. Griffin*, 50 M.J. 278, 284 (C.A.A.F. 1999). Although Mil. R. Evid. 702 has since been amended, *Houser* and *Daubert* are still employed in military courts to assess the admissibility of expert testimony under that rule. *See, e.g.*, *United States v. Henning*, 75 M.J. 187, 191 (C.A.A.F. 2016). While *Daubert* focused on scientific testimony, its factors may still be considered in cases involving testimony based on technical or other specialized knowledge, but the factors do not necessarily apply in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citation omitted). The Supreme Court has emphasized that trial judges are afforded broad latitude in deciding how to determine the reliability of expert testimony. *Id.* at 142 (citation omitted).

### b. Articles Admitted into Evidence

Under Mil. R. Evid. 702, expert witnesses "may testify in the form of an opinion or otherwise." Such witnesses may base their opinions on facts or data reasonably relied upon by experts in the particular field, even if such facts or data are not admissible in their own rights. Mil. R. Evid. 703. When an expert witness relies on otherwise inadmissible facts or data, that information may only be disclosed to court-martial members upon the military judge's determination that its probative value in helping the members evaluate the opinion substantially outweighs the disclosure's prejudicial effect. *Id.* If a military judge determines the information may be disclosed, the expert witness may still give his or her opinion without first testifying about those underlying facts or data, but the expert may also be required to disclose the information on cross-examination. Mil. R. Evid. 705. Absent an exception, out-of-court statements offered for the truth asserted in those statements are inadmissible hearsay. Mil. R. Evid. 801, 802. One such exception covers statements in learned treatises, so long as the publication is demonstrated to be a reliable authority and either called to the attention of an expert witness during cross-examination or relied on by the expert during direct examination. Mil. R. Evid. 803(18). One limitation to this exception is that any such statement admitted into evidence may only be read into evidence—the treatise itself may not be received as an exhibit. Mil. R. Evid. 803(18)(B).

### 3. Analysis

### a. Government Expert Qualification

We conclude the military judge did not err in permitting Dr. DS to provide his opinions as to the causation of SrA BT's and Appellant's wounds. Mil. R.

Evid. 702 "permits 'anyone who has substantive knowledge in a field beyond the ken of the average court member' to qualify as an expert witness." *United States v. Harris*, 46 M.J. 221, 224 (C.A.A.F. 1997) (quoting *United States v. Stark*, 30 M.J. 328, 330 (C.M.A. 1990)).[10] The touchstone for qualifying an expert is whether that person is someone who can be helpful to the factfinder in a court-martial. *Id.* (citation omitted). Here, Dr. DS had significant knowledge about physical wounds, both from a pedagogical perspective as well as from practical experience, such as when he served as an investigator wherein he would seek to determine the origins of wounds on people who did not have the ability to communicate to him how they were injured. Dr. DS demonstrated through his testimony that he relied on a variety of academic studies and scholarly articles which the Defense's own expert acknowledged were reliable sources. Considering the focus of the Defense's theory at trial centered on whether SrA BT's injuries corroborated her testimony, an expert opinion as to how her injuries were caused would be helpful to the factfinder, as the military judge concluded. Trial defense counsel did not identify any notable deficiency with respect to Dr. DS's expertise at trial, and Appellant has failed to do so on appeal.

### b. Articles Admitted into Evidence

Although the military judge's admission of various articles relied upon by the expert witnesses as exhibits did not comport with the Military Rules of Evidence, it was the Defense which first sought to admit articles—purportedly under Mil. R. Evid. 703. In doing so, Appellant abandoned the right to complain on appeal what the Defense at trial had asked the military judge to permit, thereby waiving any issue with respect to the admission of the documents as exhibits. *See, e.g.*, *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). Moreover, Appellant similarly waived any issue on appeal about the admission of the articles offered by the Government, as trial defense counsel expressly said the Defense had "no objection" to their admission. *See, e.g.*, *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009).

Appellant's argument is that trial counsel inappropriately referred to facts and statistics from those exhibits during closing argument, because the documents were only admitted for non-substantive purposes. Contrary to Appellant's claim, the Defense's exhibits were admitted after trial counsel withdrew their objection, not pursuant to a ruling from the military judge that they were being admitted for a limited purpose. As the Government offered additional

---

[10] *See also United States v. Banks*, 36 M.J. 150, 161 (C.M.A. 1992) (footnote and citation omitted) (describing the Military Rules of Evidence as creating "[l]iberal standards" for the admission of expert testimony).

exhibits, the military judge did not indicate she had adopted the Defense's position that the exhibits were admitted for some purpose other than the substantive information contained within them. Indeed, when the military judge admitted the articles offered by the Defense, she offered the parties the opportunity to limit her consideration to just certain portions of the articles, but they declined her invitation. She did not state she would only consider the articles non-substantively. It is clear from the record, however, that trial defense counsel believed the information in the exhibits was not to be used substantively, and trial counsel seemed to be operating under the same impression. The military judge never explicitly adopted that limitation, but she arguably implicitly did so by admitting the exhibits after trial defense counsel provided their caveat to their lack of objection.

Setting aside the question of why these articles—if they were not to be considered substantively—were ever offered as exhibits in the first place, we see no indication the information in the articles was used improperly. Subject to the military judge's weighing of the probative value and the prejudicial impact of otherwise inadmissible matters, parties may cross-examine an expert witness regarding such matters in order to test the witness's opinion. Mil. R. Evid. 703, 705. When this occurs in a trial before members, the military judge "should give a limiting instruction" explaining the information is not offered for its truth. *United States v. Neeley*, 25 M.J. 105, 107 (C.M.A. 1993) (citations omitted). One purpose of this construct is to prevent the "smuggling" of inadmissible hearsay "under the guise of testing the basis for expert testimony." *United States v. Schlamer*, 52 M.J. 80, 84 (C.A.A.F. 1999) (citation omitted). When, however, an expert is asked about otherwise *admissible* information— such as matters contained in a learned treatise—that information is available for the factfinder to use for the truth of the matter asserted. Mil. R. Evid. 803(18); *United States v. Jackson*, 38 M.J. 106, 110 (C.M.A. 1993) (footnote and citation omitted).

Trial defense counsel did not object to trial counsel's cross-examination of Dr. RF with statistics from the articles admitted into evidence, and trial counsel did not preemptively explain on the record whether the cross-examination questions involved the admission of substantive evidence or non-substantive information simply challenging the basis of Dr. RF's opinions.[11] As a result, the

---

[11] Ordinarily, we would test the admission of the information elicited on cross-examination for plain error due to trial defense counsel forfeiting the issue by not timely objecting. *See, e.g.*, *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014). In this case, however, it was trial defense counsel who offered the evidence in the first place, albeit for a limited purpose, so the analysis is somewhat more complicated, since trial defense counsel likely did not perceive any need to object to their own evidence until trial counsel used it in a manner the Defense did not expect during closing argument.

question of how the statistics could be used was not discussed until the Defense objected to trial counsel's closing argument. At that point, trial counsel posited the statistics came from learned treatises, and were therefore substantive evidence in the case. The military judge overruled the defense objection "consistent with" Mil. R. Evid. 803(18)(A). Although the military judge did not place much analysis on the record as to her conclusion that the statistics were available as substantive evidence by virtue of them coming from a learned treatise and being elicited during Dr. RF's cross-examination, we see nothing erroneous in her conclusion. Dr. RF testified he had relied on the documents and that he found them to be useful and reliable sources. Mil. R. Evid. 803(18) exempts statements from learned treatises from the ordinary rule against hearsay so long as the treatise is "established as a reliable authority by the expert's testimony," and such statements may be elicited on cross-examination. Under ordinary practice, the treatise would not be admitted as an exhibit. Mil. R. Evid. 803(18)(B). Trial counsel established the foundation required for the documents containing the statistics through Dr. RF's testimony that they were reliable, and we can infer the military judge so concluded based upon her ruling. Once the statistics were admitted as statements from learned treatises, trial counsel was free to argue their substantive import, and Appellant's asserted error is without merit.

## D. Sentence Reassessment

Because we set aside and dismiss the specification alleging an assault consummated by a battery upon MT, we will consider whether we can reassess the sentence in lieu of remanding the case for new sentencing proceedings. We have "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 13 (C.A.A.F. 2013) (citation omitted). If we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error . . . ." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). We consider the totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances remain admissible and relevant, and "whether the remaining offenses are of the type that [we as appellate judges] should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Winckelmann*, 73 M.J. at 15–16 (citations omitted). We find the factors in Appellant's case weigh in favor of reassessment rather than rehearing.

We conclude that in the absence of the specification we set aside, Appellant would have received a sentence of at least a bad-conduct discharge, confinement for seven months, and reduction to the grade of E-1. By setting aside the

specification, the number of specifications Appellant was convicted of is reduced from five to four, and the maximum sentence to confinement he faced is reduced from four years to two. Although an assault committed upon a child carries a substantially higher maximum sentence than a similar assault committed on an adult, SrA BT was the primary victim in the case, and she suffered significant visible injuries as a result, the most severe of which were inflicted upon her in front of 15-month-old MT. The facts of this case indicate the various assaults on SrA BT were committed in close temporal proximity to each other in two violent episodes separated by a brief respite when SrA BT took MT downstairs to change his diaper. In contrast, the purported assault on MT was brief and not only resulted in no injury, but was unlikely to cause any injury to MT. We thus conclude the specification we set aside did not significantly contribute to Appellant's sentence.

We have considered this particular Appellant, the nature and seriousness of his offenses, his record of service, and all matters contained in the record of trial, and we determine his reassessed sentence is appropriate. *See United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006) (citing *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A 1988); *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982)), *aff'd*, 65 M.J. 35 (C.A.A.F. 2007).

### III. CONCLUSION

The finding of guilty of Specification 5 of the Charge is **SET ASIDE** and **DISMISSED WITH PREJUDICE**. We reassess the sentence to a bad-conduct discharge, confinement for seven months, and reduction to the grade of E-1. The remaining findings and the sentence as reassessed are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the remaining findings and sentence as reassessed are **AFFIRMED**.

FOR THE COURT

AARON L. JONES
Deputy Clerk of the Court

26